UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| THOMAS JACKSON MILLER,<br>Plaintiff | ) | |
| | ) | Civil Action No. 1:16-cv-143-JL |
| v. | ) | |
| THE SUNAPEE DIFFERENCE, LLC<br>d/b/a MOUNT SUNAPEE RESORT,<br>Defendant | ) | |

**DEFENDANT'S REPLY MEMORANDUM**
**IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

NOW COMES the Defendant, The Sunapee Difference, LLC d/b/a Mount Sunapee Resort ("Mount Sunapee"), by and through its attorneys, Devine, Millimet & Branch, P.A., and respectfully submits the following Reply Memorandum in Support of its Motion for Judgment on the Pleadings.

## I. THE LIABILITY RELEASE DOES NOT VIOLATE RSA §225-A:24 OR RSA §225-A:23, II, b

In his objection to Mount Sunapee's Motion for Judgment on the Pleadings, plaintiff Thomas Jackson Miller ("Mr. Miller") consistently and persistently conflates a ski area operator's general affirmative duty under RSA §225-A:23, II, b to warn of routinely in progress grooming and snow making, with a limiting condition in RSA §225-A:24, I governing a skier's statutory assumption of an inherent risk of skiing. In doing so, Mr. Miller seeks to manufacture a violation of a statutory duty by which he hopes avoid the enforcement of the liability release (the "Liability Release") contained on the lift ticket he purchased prior to the subject accident.[1]

[1] Notably, although plaintiff asserts in his objection that Mount Sunapee has violated §225-A:24, he has not alleged a violation of that statute in his complaint.

RSA §225-A:23 is entitled "**Responsibilities of the Ski Area Operator.**" (Bold emphasis in original). At subsection II, entitled "Base Area; Information to Skiers and Passengers," it requires, as its title suggests, that a ski area operator provide patrons with certain information at its Base Area. RSA, § 225-A:23, II (emphasis added). It does not reach or concern information provided on (or off) skiable terrain or anywhere outside of the Base Area, including on mountain warnings of snow-making equipment. Subsection II, b on which plaintiff relies is one of three discrete subparts. It says:

> [t]he ski area operator shall warn skiers and passengers by use of the trail board, if applicable, that snow grooming or snow making operations are routinely in progress on the slopes and trails serviced by each tramway.

RSA §225-A:23, II, b (emphasis added). While this provision imposes an affirmative obligation on ski area operators, it is limited in nature. Its plain language requires only that a ski area, 1) at the base area of its operations, 2) on its trail board, 3) warn skiers generally that snow making (and snow grooming) operations are routinely in progress – and 4) even then, only "if applicable."[2] It does not impose an affirmative duty to mark or otherwise make snowmaking equipment visible. *See Nardone v. Mt. Cranmore*, Civil No. 91-114-D, Slip Op., pp. 6-7 (D.N.H. 1991) (Devine, J.) (finding that RSA 225-A:23, II, b, not applicable where snowmaking not in progress).[3]

---

[2] Well prior to plaintiff's accident on February 15, 2015, Mount Sunapee had completed all snowmaking activity for Beck Brook Trail for the 2014-2015 ski season. *See* Response of Defendant to Plaintiff's First Set of Interrogatories ("Mount Sunapee Interrogatory Responses"), Response No. 6 (last day of snowmaking on Beck Brook Trail was December 20, 2014) and No. 7 (snowmaking completed prior to date of accident and no snowmaking gun positioned on post). There is also no dispute that the post plaintiff struck is permanently affixed in the ground and that such posts remain in place even when their snowmaking guns are removed. *See id*. at No. 6 (posts installed in 2013) and No. 7 (posts extend approximately six feet underground). Relevant portions of Mount Sunapee's Interrogatory Responses are attached to Defendant's Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Defendant's Memorandum") as Exh. 4.

[3] A copy of the *Nardone* opinion is attached as Exh. E to the Affidavit in Support of Plaintiff's Objection to Defendant's Motion for Judgment on the Pleadings ("Tensen Aff.").

RSA §225-A:24 is entitled the "**Responsibilities of Skiers and Passengers.**" (Underlined emphasis added, bold emphasis in original). As its title suggests, its five subsections all impose duties and obligations upon skiers, not upon ski area operators. *See Berniger v. Meadow Green-Wildcat Corp.*, 945 F.2d 4, 7 (1st Cir. 1991) ("the title [of RSA §225-A:24] indicates the legislative intent to limit the application of this section to skiers and passengers and similar classes of individuals, which does not include a ski operator or its employees"). Subsection I, on which plaintiff relies, specifically directs that "[e]ach person who participates in the sport of skiing . . . accepts as a matter of law, the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries . . . ." (Emphasis added).[4]

In interpreting this provision, the New Hampshire Supreme Court has long-held that "ski area operators owe no duty to protect patrons from the inherent risks of skiing and thus are immunized from liability for any negligence related to these risks." *Cecere v. Loon Mountain Recreation Corp.*, 155 N.H. 289, 295 (2007) (emphasis added) (barring claim for inadequate construction, design or maintenance of a ski jump), citing *Rayeski v. Gunstock Area*, 146 N.H. 495, 499 (2001) (barring plaintiff's claims for injuries sustained after colliding with a light pole while skiing). Indeed, "[i]t is clear from the plain and unambiguous wording of this section that the legislature intended to place the burden of certain risks or dangers on skiers, for actions arising as a result of dangers inherent in the sport of skiing, rather than on ski area operators." *Berniger*, 945 F.2d at 7 (affirming N.H. District Court decision (Loughlin, J.) dismissing plaintiff

[4] Also included in this section is a directive that "[n]o skier . . . shall: * * * [s]ki or otherwise access terrain outside open and designated ski trails and slopes . . . without written permission of said operator or designee" as plaintiff was doing at the time of his injury. RSA 225-A:24, V, g. This is important, as "[n]o ski area operator shall be held responsible for ensuring the safety of, or for damages including injury or death resulting to, skiers or other persons who utilize the facilities of a ski area to access terrain outside open and designated ski trails. Ski areas shall not be liable for damages, including injury or death, to persons who venture beyond such open and designated ski trails." RSA 225-A:25, V.

skier's complaint for injuries arising out of collision with safety fence); *see also Rayeski*, 146 N.H. at 497 ("[r]ecognizing that RSA 225-A:24 essentially adopted the primary assumption of the risk doctrine, we have interpreted it to mean that ski area operators owe no duty to skiers to protect them from the inherent risks of skiing") (emphasis added).

Included among the non-exhaustive list[5] of inherent "risks, hazards, or dangers which the skier . . . assumes as a matter of law" is "plainly marked or visible snow making equipment." RSA §225-A:24, I. Contrary to plaintiff's position, nothing within this language imposes an affirmative obligation upon a ski area operator. Rather, it is directed at skiers (and passengers), and merely places a limiting condition on a skier's statutory assumption of the risk of injury from snow making equipment. If snow making equipment is plainly marked or visible, it is an inherent danger under the statute and the skier has assumed the risk of injury. Where a skier claims injury as a result of such a danger, the skier may not bring suit against the ski area. *See Berniger*, 945 F.2d at 7 ("[b]y the mere act of skiing, the skier accepts, as a matter of law, the risk that he or she might be injured in a manner that falls within the scope of" RSA 225-A:24) (emphasis added).

Plaintiff's position relies on a misreading of the relevant statutes and the *Rayeski* decision which references a prior version of RSA 225-A:23, II, b. *See Rayeski*, 146 N.H. at 498.[6] In *Rayeski*, the Court stated that the reference in RSA 225-A:24 to "plainly marked or visible snow making equipment" was meant to balance the statutory immunity provided in that section with a ski operator's duty under RSA 225-A:23, II, b "to warn skiers of snow making . . . activities by denying immunity to ski area operators who breach a statutorily imposed safety responsibility."

---

[5] *See Berniger*, 945 F.2d at 7-8 ("[b]y its express language, section 225-A:24 does not restrict itself only to claims resulting from those hazards or risks specifically enumerated. The phrase 'includ[ing] but . . . not limited to' which precedes the specification extends the statute's provisions to everything embraced in that class, though not specifically enumerated").

[6] *Rayeski* did not involve liability releases, snowmaking or snowmaking equipment.

*Rayeski*, 146 N.H. at 498 (emphasis added). Even under the prior version of RSA 225-A:23, as stated below, however, the statutory requirement to warn was only applicable to "in progress" or active snowmaking or grooming and is not implicated in the present matter.

Since the *Rayeski* decision, the legislature has changed RSA 225-A:23, II, b, in a small but significant way. The prior version stated: "[t]he ski area operator shall warn skiers . . . by use of the trail board <u>or otherwise</u>, if applicable, that snow grooming or snow making operations are routinely in progress on the slopes and trails serviced by each tramway." RSA 225-A:23, II, b (2000) (emphasis added), a copy of the version of RSA 225-A:23, II, b, effective in 2000 is attached hereto as Exh. 1.[7] The present version of the statute, effective July 1, 2005, deletes the words "or otherwise," while retaining the remaining language. The legislature's choice to delete those words has the unambiguous effect of limiting any statutorily required warning of "in progress" snowmaking (or grooming) to the trail board. In other words, whereas it might have been possible to read the prior version of the statute expansively given its use of the undefined, non-specific phrase "or otherwise," the current version limits the statutory requirement to warn (of "in progress" snowmaking) to the trail board alone. The change circumscribes section 23, precluding its extension to require "on mountain" warnings of "in progress" snowmaking. In any event, it is undisputed that there were no snowmaking activities of any kind occurring on the Beck Brook Trail on February 15, 2015, thus rendering RSA 225-A:23, II, b (either the prior or current version) inapplicable to the present matter.

## II. <u>RSA 225-A SUBSUMES A SKIER'S COMMON LAW RIGHTS.</u>

Under any provision of RSA 225-A, Mount Sunapee had no affirmative statutory duty to plainly mark or make visible the post with which plaintiff collided. As a matter of logic, Mount

[7] The *Rayeski* decision refers to the statute as RSA 225-A:23, II(b) (2000), a fact which plaintiff artfully elides. The prior version of the statute was in effect in the year 2000 (and at all times relevant to the *Rayeski* matter and its underlying events in 1997), and had been since enacted in 1979. *See id*.

Sunapee cannot be in violation of a non-existent duty. Since the New Hampshire Ski Statute (RSA Ch. 225-A:1, *et seq.*) subsumes a skier's common law rights, plaintiff cannot state a claim upon which relief can be granted and Mount Sunapee is entitled to dismissal. *See Berniger*, 945 F.2d at 7 ("the legislature intended to supersede and replace a skier's common law remedies for risks inherent in the sport of skiing"); *see also Rayeski*, 146 N.H. at 499 ("categories of injuries caused by an inherent risk of skiing and injuries caused by negligence are mutually exclusive. * * * Having determined that the plaintiff's injuries were caused by an inherent risk of skiing, we necessarily conclude that they were not caused by the defendant's negligence").

## III. A PARTY MAY VOLUNTARILY WAIVE RIGHTS AND DUTIES.

Nevertheless, even if a duty existed, plaintiff's analysis of *McGrath v. SNH Dev., Inc.*, 158 N.H. 540 (2009) and other cases does not further his argument or prevent the enforcement of the Liability Release. *McGrath* does not, as plaintiff posits, limit itself "to situations where the public statute at issue contains a statutorily imposed enforcement mechanism, which 'creates public rights enforced by state officials through imposition of criminal penalties . . . .'" Plaintiff's Memorandum of Law in Support of His Objection to Defendant's Motion for Judgment on the Pleadings ("Plaintiff's Objection"), p. 8 (citing *McGrath* at 543). Rather, in *McGrath*, the Court specifically held that "[t]he fact that an exculpatory agreement waives the right to bring a negligence action arising out of an activity that is regulated by statute is not determinative of a public policy violation." *Id.* at 543 (emphasis added). The Court went on to hold:

> [i]rrespective of the statute, the plaintiff has voluntarily agreed not to hold the ski area, or its employees, liable for injuries resulting from negligence so that she may obtain a season ski pass. Therefore, we conclude the agreements do not contravene public policy as injurious to the interests of the public, violative of a public statute or interfering with the public welfare.

*Id*. (emphasis added).[8]

The holding in *McGrath*, and its recognition of the plaintiff's operative voluntary agreement to release the ski area from any liability for negligence, even in the face of a statute allegedly governing the use and operation of the snowmobile with which she collided, is in keeping with a party's ability to waive other arguably more fundamental rights and duties under the law. For instance, parties in civil and criminal cases can voluntarily waive a statute of limitations, a right to a jury trial, venue and a right to appeal. In a civil case, a party can agree to forego the right to trial in favor of binding arbitration. Parties can also waive service of process, personal jurisdiction, agree to a choice of law or forum, disclaim a warranty or other claim, or relinquish a legal defense. In criminal matters, a defendant can give up the right to counsel, waive extradition, arraignment, indictment, and even the right to a speedy trial guaranteed under the New Hampshire and Federal Constitutions. These are significant constitutional, statutory or common law rights, all of which the law recognizes a party may voluntarily waive.

Plaintiff's argument is akin to an argument rejected in *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105 (10th Cir. 2002). In *Mincin*, the plaintiff was mountain biking and went off the designated trail and ran into an unmarked man-made drainage ditch. *Id*. at 1107. The plaintiff argued that the pre-accident liability release he had signed was invalid because it violated a landowner's duties under the Colorado Premises Liability Act (the "CPLA"). *Id*. at 1110. The court disagreed and held:

> [c]ontrary to plaintiffs' assertions, finding the exculpatory clause valid does not abrogate the [CPLA]. The CPLA does not speak to exculpatory agreements. * * *

[8] Even if *McGrath* were limited in the manner plaintiff suggests, the present matter would fall within that limitation as RSA 225-A, contrary to plaintiff's assertion, contains a "statutorily imposed enforcement provision." That provision mandates, "[a]ny person . . . violating this chapter or rules of the board shall be guilty of a violation if a natural person, or guilty of a misdemeanor if any other person." RSA 225-A:26 (Penalty).

> We also do not see the relevance of the fact that a landowner cannot delegate duties under the CPLA to, for example, an independent contractor. [Citation omitted]. The fact that certain duties of a landowner are nondelegable does not mean that the landowner and the party to whom the duty is owed may not contract to extinguish those duties.

*Id*. at 1111 n.2 (emphasis added). *See also Raup v. Vail Summit Resorts, Inc.*, 2017 U.S. Dist. LEXIS 9654, *23 (D.Colo. 2017) appeal docketed, No. 0:17-cv-01039 (10th Cir. February 3, 2017) (enforcing liability release against a recreational chairlift passenger who alleged a violation of a statutory duty under CPLA, due to a lack of any "'practical necessity[,]' as riding a chairlift is not an essential activity"); *see also B&B Livery, Inc. v. Riehl*, 960 P.2d 134, 137-138 (Colo. 1998) (enforcing liability release to dismiss claims expressly preserved under Colorado Equine Activity Liability Statute and stating "the inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed") (citation omitted).

Plaintiff's citations to cases in which courts found exculpatory language void in the face of statutes are inapposite here. Each of those matters involved a specific statutory directive concerning a standard of conduct the defendant owed to members of the public. In the present matter, there is no like directive and no prescribed affirmative duty. In *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982 (Colo. App. 1983), the plaintiff alleged injuries arising out of a collision with a sno-cat grooming machine. *Id*. at 984. The court upheld the trial court's exclusion of evidence relating to language on the back of the plaintiff's lift ticket by which the defendant contended the plaintiff had "agreed that he understood and assumed the risk of skiing."[9] *Id.* at 986. The court based its decision on a specific provision of the Colorado Ski Safety Act affirmatively requiring a ski area to post warning signs when snow grooming equipment is in use, a requirement that has no counterpart in New Hampshire. *Id*. Likewise, in

[9] Notably, the court never describes this language as exculpatory or examines it in that context.

*Laliberte v. White Water Mountain Resorts*, 2004 WL 1965868 (Conn. Super. Ct. 2004) (attached to the Tensen Aff. as Exh. A), the court applied a specific Connecticut statute that obligated the ski area "to mark conspicuously the location of snow-making devices that are placed <u>on a trail or slope</u>." *Id*. at *1 (emphasis added). The same obligation does not exist in New Hampshire.[10]

The matter of *Strawbridge v. Sugar Mt. Resort, Inc.*, 320 F. Supp. 2d 425 (W.D.N.C. 2004) is no different. Central to that case was a North Carolina statute imposing "on ski area operators the duty 'not to engage willfully <u>or negligently</u> in any type of conduct that contributes to or causes injury to another person or his properties.'" *Id*. at 433 (emphasis added). Similarly, in both *Murphy v. N. Am. River Runners*, 412 S.E.2d 504 (W. Va. 1991) and *Lee v. Sun Valley Co.*, 695 P.2d 361 (Idaho 1984), the courts were faced with statutory language affirmatively requiring guides "to conform to the standard of care expected of members of" their profession. *Murphy*, 412 S.E. 2d at 511, n.9; *Lee*, 695 P.2d at 364. All of these cases mandate an affirmative standard of conduct. There is no such affirmative mandate here.

Even the New Hampshire cases that plaintiff references have no application to the present matter. *Littky v. Winchester Sch. Dist.*, 129 N.H. 626 (1987) concerns the legislative intent in RSA 189:14-1 guarantying public school teachers certain procedural rights, and *West Gate Village Ass'n v. Dubois*, 145 N.H. 293 (2000) rejects a condominium association's attempt to proactively extend a statute of limitations before a cause of action exists.[11] Neither of these cases involve a liability release or concern the duties of ski areas and skiers under the New Hampshire Ski Statute.

---

[10] Moreover, the post with which plaintiff collided is off the side of and above the Beck Brook Trail. *See* Mount Sunapee Interrogatory Responses, Response No. 6.

[11] Although finding that the condominium association could not proactively extend a statute of limitations, the Court did "recognize that statutes of limitations may be waived." *Id*. at 298.

## IV. THE LIABILITY RELEASE IS NOT INJURIOUS TO THE INTERESTS OF THE PUBLIC.

Plaintiff premises his argument that the Liability Release violates public policy on his assertion that Mount Sunapee owes a duty of public service because it operates a ski area on State-owned land, that was developed using funding from the federal Land and Water Conservation Fund Act, 54 U.S.C. §200301, *et seq.* (the "LWCF"). Mount Sunapee has addressed this argument in large part in its Memorandum of Law in Support of Motion for Judgment on the Pleadings at pp. 13-15. Plaintiff's entire argument ignores the fact that New Hampshire has determined that availability "for public use is not dispositive of a special relationship" and that a ski area does not provide "an essential service." *McGrath*, 158 N.H. at 544 and 545. As such, Mount Sunapee is not charged with a duty of public service that is a matter of practical necessity, and the interests of the public are not implicated. *See Barnes v. New Hampshire Karting Ass'n*, 128 N.H. 102, 108 (1986).

Plaintiff's references to general statements of purpose in the lease between Mount Sunapee and the State of New Hampshire (the "Lease"), and in the LWCF enabling legislation do not alter Mount Sunapee's basic relationship with the public. Indeed, in stark contrast with other sections of plaintiff's objection, plaintiff has not cited a single authority in support of his argument that the LWCF and State ownership of the land prevent Mount Sunapee's use and enforcement of the Liability Release. Plaintiff has also misrepresented Mount Sunapee's relationship (or lack thereof) to the LWCF. Plaintiff falsely states that Mount Sunapee is "receiving federal funds intended to be used for the benefit of the public." Plaintiff's Objection, p.15. To the contrary, Mount Sunapee is a private entity and has never received federal funding of any kind, including funding pursuant to the LWCF. *See* Exh. 2, Affidavit of Jay Gamble in Support of Motion for Judgment on the Pleadings ("Gamble Aff."), para. 3.

Moreover, the State of New Hampshire itself, when it operated the Mount Sunapee ski area, used liability release language on its lift tickets. *See id*. at para. 7, and Exh. A thereto (showing 1993-1994 ski season lift ticket with liability release language and peel-off backing, and 1996 lift ticket with liability release language). In this language, the State of New Hampshire required users "to accept full responsibility for any and all injuries or property damage and agree to make no claim against the ski area or any of its owners or employees for any injury or harm to [the user] regardless of cause," all on public land that had been developed with LWCF funding. *Id*.

Plaintiff argues that similar liability release language on State-owned Cannon Mountain's lift tickets has no relevance because the language does not use the word "negligence." Plaintiff misses the point. The State itself asserts that "Cannon Mountain routinely uses liability releases in its ski area[] operations as do most ski areas in New Hampshire," and that the lift ticket language is a "lift ticket liability release" which it has used for all of its patrons since at least 2008. *See* Affidavit of George Lemerise ("Lemerise Aff."), paras. 5 and 6, attached to Defendant's Memorandum as Exh. 3. Plaintiff also ignores that Cannon Mountain uses liability releases in a number of other contexts, including its season pass, equipment rental, childcare, snowsports school and competition enrollment forms. *Id*. at para. 7 and Exh. B thereto. Whether and to what extent each of these releases is ultimately enforceable is irrelevant. What matters is that the State of New Hampshire, on State-owned land, developed in-part with LWCF funding, requires the use of liability releases for all patrons of the ski area. The State's own consistent actions and intentions over the course of decades are the best indication of its public policy.[12]

[12] Mount Sunapee is also authorized to "restrict public access," at least from plaintiff's perspective, by charging fees to the public for access and use of the ski area. Charging such fees is consistent with the State's own practice of charging fees to the public for access and use of other areas of the Mount Sunapee State Park. *See* Exh. 2, Gamble Aff., paras. 5 and 6.

## V. THE EXPRESS TERMS OF THE LIABILITY RELEASE ENCOMPASS PLAINTIFF'S CLAIM.

As described at pp. 15-19 of Defendant's Memorandum, the Liability Release clearly expresses its import and encompasses plaintiff's claim, barring this action. Plaintiff, in his objection, first completely ignores the peel-off backing on the lift ticket. That backing, in red and headed by a stop sign, clearly informs a patron that "YOU ARE RELEASING THIS SKI AREA FROM LIABILITY" and informs the user that, "[b]y removing this peel-off backing and using this ticket, you agree to be legally bound by the LIABILITY RELEASE on the other side of this ticket." *See* Exh. 2 to Defendant's Memorandum, Affidavit of Edward Albro ("Albro Aff."), and Exh. A thereto (Liability Release and peel-off backing).

Plaintiff then quotes from the Liability Release and emphasizes the word "inherent" where it appears in the text without indicating that he has added the emphasis. *See* Plaintiff's Objection, pp. 19-20. He does so in an attempt to limit the Liability Release to just those inherent categories of risk included in RSA 225-A:24, I. To get to his desired conclusion, plaintiff ignores much of the second sentence of the Liability Release, which says:

> [a]s purchaser or user of this ticket, I agree, as a condition of being allowed to use the facilities of the Mount Sunapee Resort, to freely accept and voluntarily assume all risks of property damage, personal injury, or death resulting from their inherent or any other risks or dangers.

(Emphasis added). The meaning of this sentence is clear. Moreover, the final clause, "or any other risks or dangers," is decidedly not subject to the doctrine of *esjudem generis* and *noscitur a sociis*, and is not limited to the inherent risks enumerated in the Ski Statute. Quite the opposite, it encompasses all risks and dangers of skiing beyond those which are inherent. Any other interpretation would render the words meaningless. *See Commercial Union Assurance Co. v.*

*Brown Co.*, 120 N.H. 620, 623 (1980) (requiring interpretation of contract clause that "gives meaning and effect to all the language in that clause").

Plaintiff also fails to account for the meaning and impact of the third sentence of the Liability Release (and again misquotes it by failing to use bold emphasis as in the original). The third sentence declares:

> **I RELEASE MOUNT SUNAPEE RESORT**, its parent companies, subsidiaries, affiliates, officers, directors, employees and agents **FROM ANY AND ALL LIABILITY OF ANY KIND INCLUDING NEGLIGENCE** which may result from conditions on or about the premises, operation of the ski area or its [facilities] or from my participation in skiing or other winter sports, accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause.

(Underlined emphasis added, bold emphasis in original). This language is straightforward and unequivocal, and not susceptible to limiting interpretations.

Despite the plain language of the third sentence, plaintiff attempts to minimize that language and alter its meaning by cutting the sentence short without including its ending that states: "accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause." Without quoting the end of the third sentence, Plaintiff argues that the words proceeding it serve "to obscure, rather than clarify, the Liability Release and, thus, a reasonable person 'might conclude that the agreement relieved [Mount Sunapee] of responsibility for the enumerated types of negligence only.'" Plaintiff's Objection, p. 22, quoting *Wright v. Loon Mountain Recreation Corp.*, 140 N.H. 166, 170 (1995). The third sentence, however, must be read in whole, not in part. Its various portions do not exist in a vacuum. When read altogether as written, it is clear that the Liability Release applies to "all damages or injury of any kind which may result from any cause." (Emphasis added).[13]

[13] Even accepting plaintiff's interpretation that the Liability Release applied only to negligence resulting from "conditions on or about the premises, operation of the ski area or its [facilities] or from my participation in skiing or

## VI. PLAINTIFF AFFIRMATIVELY AGREED TO THE LIABILITY RELEASE.

Plaintiff, an attorney, makes no argument that he did not read the Liability Release or did not understand it. *See* Plaintiff's Objection, pp. 24-25; *see also* Affidavit of Thomas J. Miller. He presents no issue of fact that a meeting of the minds did not occur. Moreover, he does not dispute that he removed the peel-off backing which clearly informed him that, by doing so, he was agreeing "to be legally bound by the LIABILITY RELEASE." *See* Albro Aff. attached to Defendant's Memorandum as Exh. 2, and Exh. A thereto (Liability Release and peel-off backing). If plaintiff was unwilling to be bound by the Liability Release, the peel-off backing instructed him to "please return this ticket with the peel-off backing intact to the ticket counter for a full refund" – a clear and easy rejection right. *Id.* Rather than exercise that right, plaintiff affirmatively removed the peel-off backing and proceeded to use the ticket. By those affirmative acts, he agreed to the Liability Release.

## VII. PLAINTIFF HAS NOT PLED RECKLESS, WANTON AND WILLFUL MISCONDUCT.

In his objection, plaintiff asserts that the Liability Release does not release claims for reckless, wanton and willful misconduct, yet has not made any such assertions in his operative Complaint. Accordingly, those claims are not before the Court.

## VIII. CONCLUSION

For the foregoing reasons, Mount Sunapee respectfully requests that the Court grant its Motion for Judgment on the Pleadings and dismiss plaintiff's complaint, and grant Mount Sunapee such other and further relief as is just.

---

other winter sports," it would necessarily include plaintiff's claim of injury while skiing on the premises as a result of a collision with snowmaking equipment.

Respectfully submitted,

THE SUNAPEE DIFFERENCE, LLC d/b/a
MOUNT SUNAPEE RESORT
By Their Attorneys,
DEVINE, MILLIMET & BRANCH, P.A.

Dated: March 13, 2017

By: /s/ Brendan P. Mitchell

Thomas Quarles, Jr., Esq. (NH Bar #2077)
tquarles@devinemillimet.com
Brendan P. Mitchell, Esq. (NH Bar #19652)
bmitchell@devinemillimet.com
111 Amherst Street
Manchester, NH 03101
(603) 669-1000

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been forwarded this date via the Court's ECF system to Arend R. Tensen, Esq., opposing counsel.

Dated: March 13, 2017

/s/ Brendan P. Mitchell
Brendan P. Mitchell, Esq.

\\MHT-WORLDOX\MHT$\WDOX\DOCS\CLIENTS\022014\105717\M3430455.DOCX