| | |
|---|---|
| DISTRICT COURT<br>SUMMIT COUNTY, COLORADO<br>501 North Park Avenue<br>PO Box 269, Breckenridge, CO 80424<br>970-453-2241 | DATE FILED: March 6, 2018 3:02 PM<br>CASE NUMBER: 2017CV30022 |
| **Plaintiff(s):**<br>LINDSAY MITCHELL<br><br>v.<br><br>**Defendant(s):**<br>VAIL SUMMIT RESORTS, INC. d/b/a BRECKENRIDGE SKI RESORT, and ERIK SHELLMAN, INDIVIDUALLY | ▲COURT USE ONLY▲ |
| | Case Number: 17CV30022<br>Division:  K    Courtroom:   2 |
| **ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** | |

  THIS MATTER is before the Court on Defendant Vail Summit Resorts, Inc. ("VSRI") Motion for Summary Judgment filed on November 13, 2017 ("Motion"). Plaintiff Lindsay Mitchell ("Mitchell") filed a response on December 1, 2017 ("Response"), and VSRI filed a reply on December 13, 2017 ("Reply").  Having reviewed the preceding, the exhibits attached thereto, and relevant legal authority, the Court is fully advised on the matter and hereby rules as follows.

  I.  <u>Standard of Review</u>

  The purpose of summary judgment is to "permit the parties to pierce the formal allegations of the pleadings and save the time and expense connected with a trial when, as a matter of law, based on undisputed facts, one party could not prevail."  <u>A-1 Auto Repair & Detail, Inc. v. Bilunas-Hardy</u>, 93 P.3d 598, 603 (Colo. App. 2004) (quoting <u>Mt. Emmons Mining Co. v. Town of Crested Butte</u>, 690 P.2d 231, 238 (Colo. 1984)). Summary judgment should be granted only if there is no genuine issue as to any

material fact, and the moving party is entitled to judgment as a matter of law. Peterson v. Halsted, 829 P.2d 373, 375 (Colo. 1992).

Where summary judgment is requested, the moving party has an initial burden to demonstrate an absence of evidence in the record that supports the non-moving party's case. Civil Serv. Comm'n v. Pinder, 812 P.2d 645, 649 (Colo. 1991). Once the moving party has met this initial burden, the burden shifts to the non-moving party to establish there is a triable issue of fact. Id. In making this showing, the party opposing the motion for summary judgment cannot rely on the allegations of the pleadings but must present specific facts based upon admissible evidence establishing a genuine issue for trial. See C.R.C.P. 56(e); see also Smith v. Mehaffy, 30 P.3d 727, 730 (Colo. App. 2000); Dileo v. Koltnow, 613 P.2d 318, 324 (Colo. 1980); Meuser v. Rocky Mtn. Hosp., 685 P.2d 776, 779 (Colo. App. 1984). A genuine issue of fact cannot be raised simply by means of argument. People in Interest of J.M.A., 803 P.2d 187, 193 (Colo. 1990).

In determining whether summary judgment is proper, the party opposing the motion is entitled to the benefit of all favorable inferences that may reasonably be concluded from the undisputed facts presented. Peterson, 829 P.2d at 376. This includes accepting all of the non-movant's material allegations in its pleadings as true, unless the evidence in the case indicates a lack of genuine dispute as to those material facts. See, e.g., Club Telluride Owners Ass'n, Inc. v. Mitchell, 70 P.3d 502, 503-4 (Colo. App. 2002) (citing Abrahamsen v. Mountain States Tel. & Tel. Co., 494 P.2d 1287, 1288-89 (Colo. 1972)). A trial court, however, has no alternative but to conclude that no genuine issue of material fact exists when an affirmative showing of specific facts is not contradicted by any counter-affidavits or other evidence established by the nonmoving party. Pinder, 812 P.2d at 649. Where evidence opposing summary judgment is merely colorable or not significantly probative, summary judgment may be granted. Andersen, 160 P.3d at 239.

## II. Background

This case arises out of Mitchell's injuries as a result of her use of a ski lift on February 4, 2015 while Mitchell and friends were skiing at Breckenridge Ski Resort, which is owned by VSRI.

Prior to the incident in the autumn of 2014, Mitchell purchased a travel package for a group organized event online through Lifestylez Productions ("Lifestylez") that included a ski pass and lodging at the Breckenridge Ski Resort ("Breckenridge"). Upon arrival at Breckenridge in February 2015, Mitchell received her ski pass from another member of her group. She then attached the ticket to her ski jacket.

On the morning of February 4, 2015 Mitchell and some of the members of her group decided to begin the day by riding the chairlift named the Colorado SuperChair (the "Lift") to Peak 8. The Lift seated up to six passengers on each bench carrier and was equipped with a safety bar that included a footrest. The safety bar is designed to be closed by the passengers after loading the Lift, and raised by the passengers prior to unloading.

As Mitchell and her friends were preparing to disembark, they attempted to lift the safety bar to its upright position. As Mitchell stood up at the unloading area to disembark, the safety bar's foot rest caught the hood of her jacket and caused her to crash on the unloading area. Mitchell sustained serious physical injuries as a result of the fall.

Mitchell alleges that there was a defect in the safety bar that caused the failure of the safety bar to remain in its upright position when Mitchell and friends raised the bar in order to disembark. The failure of the safety bar to stay in its upright position allowed the footrest to be in a position that was low enough to catch passengers, passengers' clothing, and passenger's personal items as passengers disembarked from the chairs. Fundamentally, Mitchell alleges this defect was the result of VSRI's failure to inspect, repair, or remediate the defect, and VSRI's failure to warn passengers of the defect.

On January 31, 2017 Mitchell filed her complaint ("Complaint") asserting five claims for relief against VSRI: two separate claims for negligence; one claim for negligence per se pursuant to the Skier Safety Act, C.R.S. § 33-44-104 ("SSA"); and two claims for violation of the Premises Liability Act.

On August 2, 2017, this Court issued an order regarding VSRI's motion to dismiss that disposed of all of Mitchell's claims except for the negligence per se claim pursuant to the SSA. In that order, the Court also converted a portion of the motion to dismiss to one for summary judgment, specifically, the portion regarding the issue of waiver. The instant Motion and this order address that issue.

### III.  Undisputed Facts

The Court finds the following facts necessary to dispose of the Motion are undisputed by the parties:

- In October and November 2014, Mitchell purchased a travel package from Lifestylez that included lodging and a ski pass at Breckenridge: Mitchell paid an initial deposit of $100 on October 31, 2015, and the remaining balance of $658.00 on November 30, 2014.
- Mitchell received her lift ticket from another member of her group on February 4, 2015, after her arrival in Breckenridge.
- For every Colorado ski area operated by VSRI's parent company, including Breckenridge, it uses only two lift ticket formats during the 2014-2015 ski season: paper tickets and media cards.
- The lift ticket that Mitchell received from a member of her group and used to board the Lift was in the form of a paper ticket.
- The following language was printed on the back side of her paper ticket:

    Warning

    Under Colorado law, a skier assumes the risk of any injury to person or property resulting from any of the inherent dangers and risks of skiing and may not recover from any

ski area operator for any injury resulting from any of the inherent dangers and risks of skiing. Inherent risks of skiing include, but are not limited to: changing weather conditions; existing natural objects, manmade objects, or other skiers; variations in terrain; the failure of skiers to ski within their own abilities; cliffs; Extreme Terrain; jumps; and Freestyle Terrain.

Under Colorado law, any person using any of the facilities of a ski area is considered a skier. This includes other activities offered including, but not limited to: sledding, skating, tubing, snowmobiling and riding snowbikes. "Holder" means the user of this ticket, AND it means the parent/legal guardian purchasing the ticket on behalf of the Holder when the Holder is under the age of 18. Holder agrees that using a ski area, including its lifts, for any purpose can be HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY OR DEATH. Holder understands that he/she is responsible for having sufficient physical dexterity and knowledge to safely load, ride and unload the lifts. Holder understands that he/she has additional duties under Colorado law, including controlling his/her speed and course at all times and maintaining a proper lookout so as to avoid other skiers and obstacles. Holder recognizes that snowcats, snowmobiles and snowmaking equipment may be encountered at any time.

In consideration for allowing Holder to use the ski area facilities, Holder agrees to ASSUME ALL RISKS, whether or not described above, known or unknown, inherent or otherwise, associated with the Holder's participation in the activities through the use of this ticket. Additionally, Holder agrees NOT TO SUE The Vail Corporation and its affiliates, including the affiliates that operate Vail, Beaver Creek, Breckenridge, and Keystone ski resorts, the United States, and all of their respective insurance carries, agents, employees, representatives, assignees, officers, directors, and shareholders (each a "RELEASED PARTY"). Holder agrees to HOLD HARMLESS AND RELEASE any RELEASED PARTY from ANY AND ALL LIABILITY and/or claims for injury or death to persons or damage to property arising from Holder's use of this ticket, including those claims based on any RELEASED PARTY's alleged or actual

>  NEGLIGENCE or BREACH of any express or implied WARRANTY.
>
>  Holder further AGREES TO DEFEND AND INDEMNIFY each RELEASED PARTY for ANY AND ALL claims of the Holder or a THIRD PARTY arising in whole or in part from the Holder's use of this ticket. Holder agrees to pay all costs and attorney's fees incurred by any RELEASED PARTY in defending a claim or suit brought by or on behalf of the Holder.
>
>  IN the case of a minor Holder, the parent/legal guardian agrees to the terms of this release on behalf of the minor Holder, agrees that THE MINOR HOLDER IS BOUND BY ALL THE TERMS OF THIS RELEASE, and agrees that but for the foregoing, the minor Holder would not be permitted to participate in the activities accessed through the use of this ticket. In consideration and exchange for using the ski area facilities, HOLDER AGREES that ALL CLAIMS for injury and/or death shall be GOVERNED BY COLORADO LAW and EXCLUSIVE JURISDICTION shall be in the District Court residing where the alleged incident occurred or in Federal Court for the State of Colorado.
>
>  Holder agrees to comply with the verbal instructions of ski area personnel and all posted signs. Holder agrees to remain alert to all hazards and to act in a careful and prudent manner at all times. Any ski area personnel may revoke this ticket if Holder engages in improper conduct that endangers Holder or other or constitutes fraud or nuisance.

## IV. <u>Analysis</u>

In the Motion, VSRI argues that the above language printed on the back of the paper ticket (the "Waiver") is an enforceable exculpatory agreement that bars Mitchell's remaining negligence per se claim. In the Response, Mitchell argues that the Waiver does not bar her negligence per se claim because the language is neither clear nor unambiguous, the Waiver alters the statutory duties prescribed by the SSA, and Waiver is a contract modification that is not supported by additional consideration. The Court

will first address the enforceability of the Waiver generally, and then address Mitchell's specific arguments regarding public policy and consideration.

**a. Enforceability**

The determination of the sufficiency and validity of an exculpatory clause is a question of law for the court to determine. B & B Livery, Inc. v. Riel, 960 P.2d 134, 136 (Colo. 1998). Exculpatory clauses are construed strictly against the party seeking to limit its liability. Hamill v. Cheley Colo. Camps, Inc., 262 P.3d 945, 948 (Colo. App. 2011).

Although exculpatory clauses that attempt to insulate a party from its liability for simple negligence are disfavored, they may still be enforceable unless they run counter to public policy. See Chadwick v. Colt Ross Outfitters, Inc., 100 P.3d 465, 467 (Colo. 2004). In assessing the enforceability of exculpatory clauses, courts in Colorado look to four factors that were propounded by the Colorado Supreme Court in Jones v. Dressel: 1) The existence of a duty to the public; 2) The nature of the service performed; 3) Whether the agreement was entered into fairly; and 4) Whether the intention of the parties is expressed in clear and unambiguous language. 623 P.2d 370, 376 (Colo. 1981). The first two Jones factors focus on broad policy implications, whereas the latter two factors focus on party and contract specific inquiries. Espinoza v. Arkansas Valley Adventures, LLC, 809 F.3d 1150, 1153 (10th Cir. 2016) (citing Jones, 623 P.2d at 378). The Court will examine the Waiver in the context of these Jones factors.

1. Duty to Public

The first two Jones factors are closely related and focus on the public policy questions asking whether "[t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity [and] . . . [a]s a result of the essential nature of the service . . . the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services." Espinoza, 809 F.3d at 1153 (citing Jones, 623 P.2d

at 376). The first <u>Jones</u> factor requires that we determine whether a duty to the public existed in the instant case, while the second <u>Jones</u> factor examines the nature of the service performed. <u>Jones</u>, 623 P.2d at 376. In reality, the factors overlap in that in order to determine whether a duty to the public exists, courts examine the nature of the service performed. The first <u>Jones</u> factor is satisfied where the service is provided is not a "practical necessity" and the second factor is satisfied where the service provided is "not essential." <u>Hamill v. Cheley Colorado Camps, Inc.</u>, 262 P.3d 945, 949 (Colo.App. 2011).

      The Colorado Supreme Court has held that businesses engaged in recreational activities that are not practically necessary do not perform services implicating a public duty. <u>Chadwick v. Colt Ross Outfitters, Inc.</u>, 100 P.3d 465, 469 (Colo. 2004). "[W]hile businesses providing, say, water, electricity, or sanitary services usually may not shield themselves from claims of negligence, recreational service providers often can." <u>Espinoza</u>, 809 F.3d at 1153. Accordingly, it is well settled that exculpatory agreements executed in connection with recreational activities generally, including skiing and snowboarding, are not practical necessities. E.g. <u>Jones</u>, 623 P.2d at 378 (skydiving); <u>Chadwick</u>, 100 P.3d at 467 (hunting and equine activities); <u>Bauer v. Aspen Highlands Skiing, Corp.</u>, 788 F.Supp. 472, 474 (D. Colo. 1992) ("Although skiing is a recreational activity enjoyed by many, by definition and common sense, it is neither a matter of great public importance nor a matter of practical necessity.").

      In the case at hand, it is clear that the Waiver was executed in connection with the activity of skiing. Although the ski and snowboard industry in Colorado is important to the state's economy and is subject to public regulation, it is not an essential service or practical necessity such as water, sewer, or sanitation services. Therefore, the Court finds that there is no public duty that prevents enforcement of the Waiver.

    2. <u>Fairness</u>

      The third <u>Jones</u> factor requires the Court to examine whether the Release was fairly entered into. "A contract is fairly entered into if one party is not so obviously

disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence." Hamill, 262 P.3d at 949. Just as in the first two Jones factors, courts have consistently considered the nature of the service provided in determining whether an imbalance of bargaining power places one party at the mercy of another. "Where . . . the service provided is a recreational service and not an essential service, there is no unfair bargaining advantage." Squires ex rel. Squires v. Goodwin, 829 F. Supp. 2d 1062, 1071 (D. Colo. 2011), aff'd sub nom. Squires v. Breckenridge Outdoor Educ. Ctr., 715 F.3d 867 (10th Cir. 2013) (citing Mincin v. Vail Holdings, Inc., 308 F.3d 1105, 1112 (10th Cir.2002) (public need and disparity of bargaining power absent in context of mountain biking and bicycle rental); Jones v. Dressel, 623 P.2d 370, 377–78 (Colo.1981) (because recreational skydiving service "was not a matter of practical necessity for even some members of the public" and thus "not an essential service," the defendant did not possess a decisive advantage of bargaining strength over plaintiff)). See also Hamill, 262 P.3d at 949-50 ("Because snowboarding is not an essential activity, Plaintiff was not 'at the mercy' of Defendants' negligence when signing the agreement.").

As discussed above, the services associated with the paper ticket are recreational rather than essential, and therefore, VSRI "did not enjoy an unfair bargaining advantage." Bauer, 788 F. Supp. at 475. The Waiver cannot be construed as an adhesion contract merely because it "is a printed form contract offered on a 'take-it-or-leave-it' basis." Jones, 623 P.2d at 375. Because snowboarding is not essential, Mitchell was free to walk away if he did not wish to assume the risks described.

The Court finds that because the services associated with the paper ticket are recreational in nature, the Waiver was fairly entered into.

3. Parties' Intentions

The fourth Jones factor requires the Court to evaluate whether the parties' intentions were expressed in clear and unambiguous language in the agreement. Interpretation of a written contract and the determination of whether a provision in the

contract is ambiguous are questions of law. Squires, 829 F. Supp. 2d at 1071-72 (quoting Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996)).

"Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." Id. (quoting Ad Two, Inc. v. City and County of Denver, 9 P.3d 373, 376 (Colo. 2000)). "In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions." Id. (quoting Ringquist v. Wall Custom Homes LLC, 176 P.3d 846, 849 (Colo. App. 2007)). "The meaning and effect of a contract is to be determined from a review of the entire instrument, not merely from isolated clauses or phrases." Moland v. Industrial Claim Appeals Office of State, 111 P.3d 507, 510 (Colo. App. 2004). The inquiry is not whether specific terms such as "negligence" are used, but rather "whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." Heil, 784 P.2d at 785.

In determining whether the terms of release agreements are clear and unambiguous, courts consider the length and complication of the agreement, whether the agreement contains legal jargon, and whether the agreement adequately describes the risks associated with the activity involved in the service provided to the participant. Hamill, 262 P.2d at 951; See also Chadwick, 100 P.3d at 467 (the Colorado Supreme Court has "previously examined the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions").

The Waiver is not inordinately long. If the language was expressed in the same typeface as this order—double spaced, twelve point type size—then it would take up under two pages. The language as printed on the back of the paper ticket is quite small, however, it may be read without resorting to a magnifying glass. Cf. Stone v. Life Time Fitness, Inc., --- P.3d ---, 2016 WL 7473806, *4 (Colo. App. 2016) (finding that a "provision that would exempt its drafter from any liability occasioned by his fault

should not compel resort to a magnifying glass and lexicon.") (internal quotations and citations omitted).

Although the waiver does contain some legal terms and phrases, the Court does not find that it is "replete with legal jargon." Id. The presence of some legal jargon does not necessarily render the clause ambiguous where the intent of the exculpatory language as a whole is clear. Read in the full context of the Waiver, there is nothing ambiguous about the phrases "assume all risks" or the words "assignees" and "affiliates." See Lawton v. Hotspur Co., 2017 WL 2672110, *5 (D. Colo. 2017); See also Patterson v. Powdermonarch, L.L.C., 2017 WL 4158487 (D. Colo. 2017). The phrase "breach of express or implied warranty" and the term "indemnify" may be beyond the layperson's understanding, but the singular presence of these terms does not render the entire Waiver ambiguous.

The Waiver clearly defines "inherent dangers and risks of skiing" in a manner completely consistent with the SSA. Other terms such as "Holder" and "Released Party" are clearly defined within the text of the Waiver. The Waiver refers to Colorado Law generally, but does not require the reader to cross reference any code or statutes in order to understand the Waiver. Cf. Stone 2016 WL 7473806 at *4 (finding that a vague reference to chapters of an unspecified code was ambiguous and confusing).

The Waiver clearly expresses VSRI's intent to preclude litigation involving injuries that result from using the lifts. The Waiver states in relevant part that:

> Holder agrees that using a ski area, including its lifts, for any purpose can be HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY OR DEATH. Holder understands that he/she is responsible for having sufficient physical dexterity and knowledge to safely load, ride and unload the lifts.

The Waiver then goes on to explain that the "Holder agrees to ASSUME ALL RISKS" associated with the use of the ticket, and that "Holder agrees NOT TO SUE" VSRI and its affiliates that are individually named, including Breckenridge. It further specifies that "Holder agrees to HOLD HARMLESS AND RELEASE [VSRI] from ANY AND

ALL LIABILITY and/or claims for injury or death . . . based on any RELEASED PARTY's alleged or actual NEGLIGENCE . . ." The waiver "cannot reasonably be understood as expressing anything other than an intent to release" or bar suit against VSRI from claims arising as a result of Mitchell's participation in skiing, which involves loading and unloading the Lift. Chadwick v. Colt Ross Outfitters, Inc., 100 P.3d 465, 468 (Colo. 2004).

The Court finds as a matter of law that the intent of the Waiver is clear and unambiguous. Having found that the Waiver satisfies all four Jones factors, the Court will now address Mitchell's remaining arguments regarding public policy and consideration.

### b. SSA

Although analysis of the Jones factors is sufficient to determine the validity of an exculpatory clause, the Colorado Supreme Court has identified other public policy considerations affecting the enforceability of exculpatory agreements, without regard to the Jones factors. Brigance v. Vail Summit Resorts, Inc., ---F.3d ---, 2018 WL 314942. *12 (10th Cir. 2018) (citing Boles v. Sun Ergoline, Inc., 223 P.3d 724, 726 ( Colo. 2010)). In this vein, Mitchell argues that the Waiver is unenforceable as contrary to public policy because it is in conflict with SSA's general policy, which is to define the responsibilities of ski area operators and skiers. For support, Mitchell relies primarily on Phillips v. Monarch Recreation Corp., 668 P.2d 982 (Colo. App. 1983).

In Phillips, the Colorado Court of appeals state that "[s]tatutory provisions may not be modified by private agreement if doing so would violate the public policy expressed in the statute." Id. at 987. Applying this principle, the Phillips court concluded that because the SSA "allocate[s] the parties' respective duties with regard to the safety of those around them, . . . the trial court correctly excluded a purported [exculpatory] agreement intended to alter those duties." Id.

Phillips, however, did not involve a determination of whether the waiver in that case was enforceable. Rather, the issue in Phillips was whether the trial court properly

excluded the exculpatory language printed on the back of the lift ticket as affirmative defense evidence that the plaintiff had agreed to and understood that he assumed the risk of skiing.

Further, the Phillips decision appears to be inconsistent with more recent pronouncements of the Colorado Supreme Court regarding the enforceability of exculpatory agreements in the context of recreational activities where statutory duties were implicated. Chadwick, 100 P.3d at 467 (enforcing liability release against claim by horseback rider based on allegation that company violated its statutory duty to provide tack for animal assigned to the rider); See also B & B Livery, Inc. v. Riehl, 960 P.2d 134, 137-38 (Colo. 1998) (involving the same statutory duty as Chadwick). Colorado Federal courts have employed the same reasoning, specifically in the context of the SSA. Brigance, 2018 WL 314942 at *14 (expressly rejecting the Phillips court's application of exculpatory agreement to the SSA); Patterson, 2017 WL 4158487 at *9 (rejecting the plaintiff's argument that a ski area "cannot contract away its statutory duties" under the SSA).

The above cases are a reflection of Colorado's public policy towards recreational pursuits, which was eloquently articulated in a recent decision by the Tenth Circuit Court of Appeals:

> This relatively permissive public policy toward recreational releases may not be unique to Colorado common law but it does seem to be one of its distinguishing features. We don't doubt other states may rationally choose to pursue different lines when it comes to recreational releases: certainly the parties before us cite an array of cases from other jurisdictions taking an array of views. But in our federal system, states are usually permitted (and encouraged) to pursue their own paths on policy matters like these. And it's clear enough that Colorado allows private parties to assume some of the risks associated with their recreational pursuits. It's a policy choice that, no doubt, means some losses go uncompensated but one that also promotes the output and diversity of recreational services consumers may enjoy. Of course, the Colorado Supreme Court and the Colorado General Assembly may change their judgment on this score

> at any time. And maybe someday they will prefer a policy that shifts the burden of loss to the service provider, ensuring compensation in cases like this even if also impairing to some degree individual choice and output. But that decision is their decision to make, not ours, and their current policy is clear. Indeed, following the Colorado Supreme Court's guidance in this area, this court and many Colorado courts have upheld many releases in many recreational activities over many years.

Espinoza, 809 F.3d at 1153. This broad underlying policy is one reason that Colorado courts place such an emphasis on the nature of the service provided in determining whether the party seeking exculpation has a duty to the public. As discussed above in the Court's application of the Jones factors, the Court has already determined that due to the recreational nature of the service provided in this case, there is no public duty that prevents enforcement of the Waiver.

And finally, although the SSA does identify various duties and responsibilities of ski area operators, it does not expressly or implicitly preclude private parties for contractually releasing liability from negligence claims through the use of an exculpatory agreement. "Colorado law has long permitted parties to contract away negligence claims in the recreational context" and courts "generally will not assume that the General Assembly mean[t] to displace background common law principles absent some clear legislative expression of that intent." Brigance, 2018 WL 314942 at *13 (quoting Espinoza, 809 F.3d at 1155).

The Court finds as a matter of law that enforcement of the Waiver does not contradict the underlying policy embodied in the SSA.

### c. Consideration

Mitchell also argues that because VSRI did not provide her with the ticket until months after she purchased it, the language on the back of the ticket was an invalid attempt by VSRI to modify the contract with Mitchell without any additional

consideration. This argument, however, is neither supported by the allegations in the complaint, nor by evidence submitted with the Response.

Mitchell did not make a contract with VSRI months before her trip, but rather with Lifestylez. Thus, there was no pre-existing contract with VSRI that could have been altered without consideration. Mitchell's contractual relationship with VSRI began when she picked up her ticket and used it on the first day of her trip. This is no different than one who uses a third party service to acquire tickets to a sporting event: the terms on the ticket are binding on the purchaser, even if it wasn't purchased directly from the company that puts on the event.

The Court finds as a matter of law that Mitchell failed to present specific facts that would establish a genuine issue for trial in regard to contract formation.

## V.     Conclusion

For the aforementioned reasons, the Court finds that there are no disputed issues of fact in regard to the enforceability of the Waiver, and that the Waiver acts to bar Mitchell's claim under the SSA. Therefore, the Motion is GRANTED.

SO ORDERED this 6th day of March, 2018.

BY THE COURT

_____
Karen Ann Romeo
District Court Judge