UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Thomas Jackson Miller

v.                                          Civil No. 16-cv-143-JL
                                            Opinion No. 2018 DNH 072

The Sunapee Difference, LLC
d/b/a Mount Sunapee Resort


**MEMORANDUM ORDER**


The plaintiff in this case, a skier at New Hampshire's
Mount Sunapee resort, was injured when he struck a support post
for snow making equipment.  At issue in this case is whether a
release attached to his lift ticket excuses the ski area for
liability in connection with its alleged negligence in failing
to mark the post, warn skiers about it, or otherwise make it
visible.

Invoking the court's diversity jurisdiction, 28 U.S.C. §
1332(a), plaintiff Thomas Jackson Miller, a New York resident,
sued The Sunapee Difference, LLC, operator of the Mount Sunapee
Resort ("Mount Sunapee"), a New Hampshire ski area, for injuries
he sustained when he struck the unmarked and unpadded post that
was concealed by fresh snow.  Pursuant to Fed. R. Civ. P. 12(c),
Mount Sunapee moved for judgment on the pleadings, arguing that
the liability release printed on Miller's lift ticket bars his
claim.  Miller argues that the release is unenforceable under

New Hampshire law and inapplicable on its face.  As both sides submitted documents outside the pleadings in litigating this motion, the court has, with the parties' consent,[1] converted the motion into one for summary judgment under Fed. R. Civ. P. 12(d).[2]  Having considered the parties' filings and hearing oral argument, the court finds that the release is both applicable and enforceable, and therefore grants summary judgment in favor of Mount Sunapee.[3]

---

[1] Counsel for both parties assented to the conversion in an on-the-record telephone conference with the court on July 14, 2017.

[2] Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

[3] The court has considered defendant's motion to strike plaintiff's expert disclosure.  Doc. no. 59.  While defendant's timeliness argument is not without merit, the court herewith denies the motion and has taken the opinion of Dr. Wilcox, plaintiff's human factors expert, into consideration in reaching its decision.  That said, contrary to the plaintiff's assertion, see Pltff. Obj., doc. no. 62, at 1, the court does not find the defendant's motion "baseless," "farcical," or "frivolous."

# I.  Applicable legal standard

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court "constru[es] the record in the light most favorable to the nonmoving party and resolv[es] all reasonable inferences in that party's favor."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).  In the summary judgment analysis, "a fact is 'material' if it has the potential of determining the outcome of the litigation."  Maymi v. P.R. Ports. Auth., 515 F.3d 20, 25 (1st Cir. 2008).  A factual dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (citation and internal quotation marks omitted).  Nevertheless, if the nonmoving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

## II.  Background

Following a large 2015 snowfall, Miller visited Mount
Sunapee with his brother and father for a day of skiing.  Miller
was skiing ahead of his companions through fresh powder on the
left side of the Beck Brook trail[4] when he struck an unmarked
"snow gun holder" that was concealed by snow.  The "holder" –
essentially a steel pipe protruding from the ground – is a
mounting post for snow-making guns.  The post remains embedded
in the ground after the guns are removed.  There was no snow-
making gun in the holder at the time of this accident.  Miller
suffered serious leg injuries in the collision.

In order to ski at Mount Sunapee, Miller first purchased a
lift ticket.  The ticket has a self-adhesive backing, which the
skier affixes to his zipper tab or similar visible location.  In
order to attach it, the skier must first remove it from a peel-
off backing.  Printed on the back of the peel-off backing of the
Mount Sunapee lift ticket was the following:

---

[4] The parties dispute whether Miller was on the trail when the
collision occurred.  The court need not resolve that dispute to
decide this motion.

STOP
[a red octagon image similar to a traffic-control "stop sign"]


YOU ARE RELEASING THIS SKI AREA
FROM LIABILITY


By removing this peel-off backing and using this ticket, you agree to be legally bound by the LIABILITY RELEASE printed on the other side of this ticket.  If you are not willing to be bound by this LIABILITY RELEASE, please return this ticket with the peel-off backing intact to the ticket counter for a full refund.

The lift ticket itself displayed the following language:

**LIABILITY RELEASE**

Skiing, snowboarding, and other winter sports are inherently dangerous and risky with many hazards that can cause injury or death.  As purchaser or user of this ticket, I agree, as a condition of being allowed to use the facilities of the Mount Sunapee resort, to freely accept and voluntarily assume all risks of property damage, personal injury, or death resulting from their inherent or any other risks or dangers.  **I RELEASE MOUNT SUNAPEE RESORT**, its parent companies, subsidiaries, affiliates, officers, directors, employees and agents **FROM ANY AND ALL LIABILITY OF ANY KIND INCLUDING NEGLIGENCE** which may result from conditions on or about the premises, operation of the ski area or its afacilities [sic] or from my participation in skiing or other winter sports, accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause.  Further I agree that any claim which I bring against Mount Sunapee Resort, its officers, directors, employees or agents shall be brought only in Federal or State courts in the State of New Hampshire.  I agree my likeness may be used for promotional purposes.


MOUNT SUNAPEE CARES, SKI RESPONSIBLY AND ALWAYS IN CONTROL.
**RECKLESS SKIING WILL RESULT IN LOSS OF TICKET**

> NON-TRANSFERABLE: Use by a non-purchaser constitutes
> theft of services.
> NON-REFUNDABLE. LOST TICKETS WILL NOT BE REPLACED
> Mount Sunapee Resort, P.O. Box 2021, Newbury, NH 03255

(Emphasis in original).

After timely filing this lawsuit,[5] Miller filed an Amended Complaint[6] asserting a single count of negligence.  He alleges that Mount Sunapee failed to mark or warn skiers of the pipe, or otherwise mitigate its danger to skiers, by, for example, padding it or making it visible to skiers.  In addition, Miller alleges that Mount Sunapee breached its duties to create a safe environment for guests, and to perform in-season trail maintenance work.  Finally, Miller claims that Mount Sunapee is liable because it failed to comply with N.H. Rev. Stat. Ann. § 225-A:23 (II)(b), which provides, in relevant part, that "[t]he ski area operator shall warn skiers and passengers by use of the trail board, if applicable, that snow grooming or snow making

---

[5] Prior to filing suit, plaintiff provided Mount Sunapee with the statutorily-required notice of his claim.  See N.H. Rev. Stat. Ann. § 225-A:25, IV (requiring notice of injury to ski area within 90 days of injury as condition precedent to lawsuit).

[6] Doc. no. 34.

operations are routinely in progress on the slopes and trails
serviced by each tramway."[7]

## III. Analysis

As noted at the outset, Sunapee argues that the release
printed on Miller's lift ticket – in combination with the
acceptance of its terms on the backing sheet – bars his claim.
"Although New Hampshire law generally prohibits a plaintiff from
releasing a defendant from liability for negligent conduct, in
limited circumstances a plaintiff can expressly consent by
contract to assume the risk of injury caused by a defendant's
negligence."  Allen v. Dover Co-Recreational Softball League,
148 N.H. 407, 413 (2002).  Such an exculpatory contract is
enforceable if:  1) it does not violate public policy; 2) the
plaintiff understood the import of the agreement or a reasonable
person in [plaintiff's] position would have understood the
import of the agreement; and 3) the plaintiff's claims fall
within the contemplation of the parties when they executed the
contract.  McGrath v. SNH Dev., Inc., 158 N.H. 540, 542 (2009)

---

[7] Id. at ¶¶ 39-43.

(citing <u>Dean v. McDonald</u>, 147 N.H. 263, 266-67 (2008)); <u>Lizzol v. Brothers Prop. Mgmt. Corp.</u>, 2016 DNH 1999, 7.

Plaintiff argues that the release satisfies none of these criteria, because: 1) it violates public policy; 2) a reasonable person would have understood the release to exclude only "inherent risks of skiing," as enumerated in New Hampshire's "ski statute," N.H. Rev. Stat. Ann. § 225-A:24; 3) the release does not encompass reckless, wanton, or willful conduct; and 4) the release is unsigned.


## A.  Public policy

"A defendant seeking to avoid liability must show that an exculpatory agreement does not contravene public policy; i.e., that no special relationship existed between the parties and that there was no other disparity in bargaining power." <u>McGrath</u>, 158 N.H. at 543 (quoting <u>Barnes v. N.H. Karting Assoc.</u>, 128 N.H. 102, 106 (1986)).  The New Hampshire Supreme Court has also found an agreement to be against public policy "if, among other things, it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety."  <u>Id.</u> (citing <u>Harper v. Healthsource New Hampshire</u>, 140 N.H. 770, 775 (1996)).  Miller does not argue

that he had a special relationship with Mount Sunapee or that there was a disparity in bargaining power between the two.[8] Instead, he confines his public policy argument to two points: 1) that the release violates New Hampshire statutory law; and 2) that it is injurious to the interest of the public. Neither argument withstands scrutiny.

1.  New Hampshire statutory law

    Miller argues that the combination of N.H. Rev. Stat. Ann. §§ 225-A:23, II, and 225-A:24 requires ski area operators to plainly mark or make visible snow-making equipment. Therefore, he concludes, applying the release to the allegedly hidden snow gun holder would allow Mount Sunapee to impermissibly evade this statutory responsibility. As a general proposition, Miller is correct that a release can not excuse a ski area's statutory violation. Harper, 140 N.H. at 775; cf. Nutbrown v. Mount Cranmore, 140 N.H. 675, 683 (1996) (noting, in ski accident case, that ski areas' immunity does not apply to claim based on statutory violation). However, Miller's argument here is built on a faulty premise – that § 225-A:24, denoted "Responsibilities

---

[8] Plaintiff's filings do not advance these arguments, and his counsel affirmatively disavowed them at oral argument.

of Skiers and Passengers" – imposes an affirmative duty on ski areas to mark or make visible snow-making equipment.  The court rejects this argument for several reasons.

First, Miller attempts, without legal support, to create an affirmative duty out of the text of § 225-A:24 where none exists.  Section 225-A:24 "is an immunity provision for ski area operators."  Cecere v. Loon Mountain Recreation Corp., 155 N.H. 289, 291 (2007).  It has been "interpreted to mean that ski area operators owe no duty to skiers to protect them from the inherent risks of skiing."  Rayeski v. Gunstock Area/Gunstock Area Comm'n, 146 N.H. 495, 497 (2001).  One of the inherent "risks, hazards, or dangers which the skier . . . assumes as a matter of law" is "plainly marked or visible snow making equipment."  N.H. Rev. Stat. Ann. § 225-A:24, I.  Miller argues that because unmarked or not visible snow-making equipment is not "an inherent risk" enumerated by the statute, ski areas therefore have a statutory duty to mark them or make them visible.

This argument is both contrary to the language of the statute and unsupported by any legal authority.  While the language of the statutory immunity provision – enumerating a "Skier's Responsibilities" – arguably does not bar Miller's

claim[9] that he struck an unmarked and not visible piece of
equipment, it likewise creates no affirmative duties for ski
areas.  Stated differently, while New Hampshire law may <u>allow</u>
ski area liability for injuries resulting from collisions with
unmarked equipment, it does not logically follow that New
Hampshire law <u>requires</u> the marking of such equipment.  The
statute sets forth no such obligation or legal duty.

To avoid the plain language of §225-A:24, Miller argues
that <u>Rayeski</u>, <u>supra</u>, imposes an affirmative duty on Mount
Sunapee when read in conjunction with § 225-A:23.  In that case,
the New Hampshire Supreme Court, invoking §225-A:24, upheld the
dismissal of a skier's claim for injuries sustained in a
collision with an unmarked light pole.  146 N.H. at 500.  The
plaintiff in <u>Rayeski</u> argued that the light pole collision was
similar to a collision with unmarked snow-making equipment,
which the statute "implies . . . is not an inherent risk of
skiing" by not barring such a claim.  <u>Id.</u> at 498.  In the course
of finding that the pole collision <u>was</u> an inherent risk of
skiing (despite not being specifically enumerated as such in the

---

[9] Mount Sunapee has not relied upon immunity under § 225-A:24 as
a basis for dismissal.

statute), the Court distinguished between poles and snow making
equipment:

> We conclude that the legislature's explicit reference
> to "plainly marked or visible snow making equipment"
> was intended to balance the immunity granted to ski
> area operators under RSA 225-A:24 with their <u>duty
> under RSA 225-A:23, II(b) (2000) to warn skiers of
> snow making or grooming activities by denying immunity
> to ski area operators who breach a statutorily imposed
> safety responsibility</u>.

<u>Id.</u> (emphasis added).

Based on the emphasized language, Miller argues that § 225-
A:23 required Mount Sunapee to mark or make visible the snow gun
holder he struck.  This argument ignores the plain language both
of <u>Rayeski</u> and the statute.  The <u>Rayeski</u> opinion referred only
to "snow making or grooming <u>activities</u>," and made no reference
to marking equipment.  And the statute, captioned "Base Area;
Information to Skiers and Passengers," requires that a ski area
operator "warn skiers and passengers <u>by use of the trail board</u>,
<u>if applicable</u>, that snow grooming or snow making <u>operations</u> are
routinely in progress on the slopes and trails serviced by each
tramway." (Emphasis added).  Thus, contrary to Miller's
argument, this section imposes no requirement to "mark or make
visible" the snow gun holder at issue in this case.  Instead,
the statute requires the ski area to post "<u>at the base area</u>" a
warning concerning <u>grooming and snowmaking operations</u>, if

applicable.[10]  See Nardone v. Mt. Cranmore, Civ. No. 91-114-SD,
slip op. at 6-7 (holding that § 225-A:23(b)'s warning
requirement does not apply where snowmaking was not in progress
and where plaintiff collided with fixed, unmarked piece of
snowmaking equipment) (emphasis added).[11]  Miller does not
dispute Mount Sunapee's contention that there was no grooming or
snow making "in progress" at the time of or in the vicinity of
Miller's accident.[12]  An inoperative snow gun holder is neither
an "activity" nor an "operation."

_____

[10] Also militating against Miller's argument is the fact that
N.H. Rev. Stat. Ann. § 225-A:23, II, b, has been amended since
Rayeski.  The version then in effect required ski area operators
to warn skiers of grooming or snow making operations "by use of
the trail board, or otherwise." N.H. Rev. Stat. Ann. § 225-A:23,
II, b (2000).  The 2005 amendment deleted the words "or
otherwise," thus conclusively limiting the ski area operator's
duty to post warnings of snow making or grooming operations to
the trail board.

[11] The court also notes that subsection III of § 225-A:23, which
is captioned by the potentially more relevant "Ski Trails and
Slopes; Information and Warning to Skiers and Other Persons,"
contains no requirement that ski areas "mark or make visible"
snow making equipment.

[12] Mount Sunapee's uncontradicted assertion is that by the date
of Miller's accident, snowmaking had concluded for the season.
Def. Reply Mem. of Law, doc. no. 11-1, at ¶ 19; id., Ex. 4
(defendant's interrogatory answers).

Further undermining Miller's argument that § 255-A:24
creates obligations for ski area <u>operators</u> is the fact that its
five sub-sections are explicitly and unambiguously addressed to
<u>skiers and passengers</u> (as opposed to ski area <u>operators</u>), as
follows:  I) "<u>Each person who participates in the sport of
skiing</u> . . . accepts . . . the dangers inherent in the sport . .
. ."; II) "<u>Each skier and passenger</u> shall have the sole
responsibility . . . "; III) "<u>Each skier or passenger</u> shall
conduct himself or herself . . ."; IV) "<u>Each passenger</u> shall be
the sole judge of his ability . . ."; V) "<u>No skier or passenger</u>
or other person shall . . ."  N.H. Rev. Stat. Ann. § 225-A:24,
I-V (emphasis added).

In addition, under New Hampshire statutory construction
law, "[t]he title of a statute is 'significant when considered
in connection with . . . ambiguities inherent in its language.'"
<u>Appeal of Weaver</u>, 150 N.H. 254, 256 (2003) (quoting <u>State v.
Rosario</u>, 148 N.H. 488, 491 (2002); <u>see also</u>, <u>Berninger v. Meadow
Green-Wildcat Corp.</u>, 945 F.2d 4, 9 (1st Cir. 1991) (interpreting
N.H. Rev. Stat. Ann. § 225-A:24 and observing that "[i]t is well
established that a statute's title may aid in construing any
ambiguities in a statute.").  As noted, the title of § 225-A:24
is explicitly directed at "skiers and passengers," not ski area

operators.  While this court discerns no such ambiguity that
would justify a foray into ascertaining "legislative intent,"
our Court of Appeals has stated that "the title indicates the
legislative intent to limit the application of [§ 225-A:24] to
skiers and passengers and similar classes of individuals, which
does not include a ski operator or its employees."  Berninger,
945 F.2d at 9 (1st Cir. 1991).  This conclusion is buttressed by
the fact that the preceding provision, § 225-A:23, is captioned
"Responsibilities of Ski Area Operators," further suggesting §
225-A:24's inapplicability here.  This statutory structure –
clearly distinguishing ski area operator responsibilities from
visitor responsibilities – is especially important in light of
the New Hampshire Supreme Court's requirement that statutes be
construed "as a whole."  Petition of Carrier, 165 N.H. 719, 721
(2013); see also, Univ. of Texas Sw. Med. Ctr v. Nassar, 133 S.
Ct. 2517, 2529 (2013) ("Just as Congress' choice of words is
presumed to be deliberate, so too are its structural choices.");
DeVere v. Attorney General, 146 N.H. 762, 766 (2001) (noting
that structure of a statute can be an interpretive tool).

Accordingly, the court finds that the Mount Sunapee release does not impermissibly seek to avoid statutory liability.[13]

In addition to his misplaced reliance on <u>Rayeski</u>, Miller also argues that the <u>McGrath</u> Court's allowance of liability releases is "limited to situations where the public statute at issue contains a statutorily imposed enforcement mechanism," which allows state officials to protect the public interest by imposing penalties on violators.[14]

The holding in <u>McGrath</u>, which involved a snowmobiling accident, is not as broad as plaintiff posits. It is true that the Court in <u>McGrath</u>, in rejecting a claim that a liability waiver violated public policy because it allowed defendants to avoid certain snowmobile safety statutes, noted that the waiver did not affect the State's ability to enforce snowmobiling rules

---

[13] Plaintiff cites cases from various states in which courts rejected exculpatory language. All are inapposite however, because they involve particular statutory violations that do not exist here. <u>See</u>, <u>e.g.</u>, <u>Phillips v. Monarch Recreation Corp.</u>, 668 P.2d 982, 984 (Colo. App. 1983) (skier collision with grooming machine; statute required warning signs when grooming machines were in use); <u>Laliberte v. White Water Mountain Resorts</u>, No. X07CV030083300S, 2004 WL 1965868 at *1 (Conn. Super. Ct. 2004) (collision with snowmaking device; statute required marking of snowmaking devices on trails).

[14] Pltff. Mem. of Law, doc. no. 15-3, at 8.

and penalize infractions, and thus did not entirely relieve the defendant property owners of any statutory responsibility. 158 N.H. at 543 (citing N.H. Rev. Stat. Ann. §§ 215-C:32 and 34). But several factors undercut Miller's reliance on McGrath. First, plaintiff's argument is premised on his assertion that Mount Sunapee is trying to avoid liability for a statutory violation. The court has already rejected plaintiff's premise as an untenable reading of §§ 225-A:23 and 24. Next, the State enforcement criterion was not dispositive in McGrath, as the Court found that the liability waiver did not contravene public policy because, "[i]rrespective of the statute, the plaintiff has voluntarily agreed not to hold the ski area, or its employees, liable for injuries resulting from negligence so that she may obtain a season ski pass." Id. at 543 (emphasis added). In addition, even if the court read McGrath to require a state law enforcement vehicle to protect the public interest, the New Hampshire ski statutes do in fact provide one. Under N.H. Rev. Stat. Ann. § 225-A:26, "any person . . . violating this chapter . . . shall be guilty of a violation if a natural person, or guilty of a misdemeanor if any other person."

Plaintiff argues that this statutory enforcement provision is limited to tramway operations, and thus does not satisfy

<u>McGrath</u>.  He supports this argument with a letter from a supervisor at the New Hampshire Division of Fire Safety,[15] which correctly observes, pursuant to N.H. Rev. Stat. Ann. § 225-A:3-a, that the authority of the Passenger Tramway Safety Board is limited to ski lift operations and "shall not extend to any other matters relative to the operation of a ski area."[16]  The letter also states that the penalty provision of § 225-A:26 "specifically relates to operating a tramway without it first being registered."[17]  The letter also specifically mentions §§ 225-A:23 and 24, as being outside the tramway board's authority.[18]

There are several reasons why the letter does not advance plaintiff's statutory argument.  First, the letter is not properly part of the summary judgment record.  According to its terms, it was sent in response to plaintiff's counsel's request for documents concerning the enforcement of § 225-A:26.

---

[15] The New Hampshire Division of Fire Safety is part of the state's Department of Safety, to which the Tramway Safety Board is "administratively attached."  <u>See</u> N.H. Rev. Stat. Ann. § 225-A:1-a.

[16] Doc. no. 66-6.

[17] <u>Id.</u>

[18] <u>Id.</u>

However, "[i]n opposing a motion for summary judgment, a plaintiff must proffer <u>admissible</u> evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." <u>Gomez-Gonzalez v. Rural Opportunities, Inc.</u>, 626 F.3d 654, 662 n.3 (1st Cir. 2010) (emphasis added). The letter itself is inadmissible hearsay, as it is being offered to prove the truth of the matters asserted with respect to enforcement of § 225-A:23 and 24. <u>See</u> Fed. R. Evid. 801(c)(2); <u>see also</u> <u>Hannon v. Beard</u>, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."). Moreover, although apparently issued by a government office (the plaintiff made no effort to lay such a foundation), the letter is not admissible under the Public Records hearsay exception. <u>See</u> Fed. R. Evid. 803(8) (requiring, for admissibility, the evidence in question to, <u>inter alia</u>, set out the public office's activities and involve a matter observed while under a legal duty to report). It is true that some forms of evidence, such as affidavits and declarations, may be considered on summary judgment, even if they would not be admissible at trial, so long as they "set out facts that would be admissible in evidence" if the affiant or declarant testified

to them at trial.  Fed. R. Civ. P. 56(c)(4).  The letter in question, however, is neither an affidavit nor a declaration. In addition to being an unsworn letter, it fails to show how the letter writer is expressing "personal knowledge," and fails to show that she is "competent to testify on the matters stated," as required by Fed. R. Civ. P. 56(c)(4); see also Fed. R. Civ. P. 602 (personal knowledge requirement).

Next, even if the letter was properly before the court, it lacks any legal force, either as a pronouncement of New Hampshire law, or an interpretation thereof.  N.H. Rev. Stat. Ann. § 225-A:8 empowers the Tramway Safety Board to make rules regarding tramways.  "Rules and Regulations promulgated by administrative agencies, pursuant to a valid delegation of authority, have the full force and effect of laws."  State v. Elementis Chem., 152 N.H. 794, 803 (2005). Under New Hampshire administrative law, however, as set forth under its Administrative Procedure Act, the letter in question is not a rule, and thus lacks such force.  It is simply a letter answering a question posed by the plaintiff's lawyer.  See N.H. Rev. Stat. Ann. § 541-A:1, XV (explicitly excluding, under definition of "Rule," "informational pamphlets, letters or other explanatory materials which refer to a statute or rule without

affecting its substance or interpretation").  Notably, the
plaintiff cites no provision of New Hampshire's administrative
law involving the Passenger Tramway Safety Board or Rules which
support his theory.  <u>See</u> N.H. Code. Admin. R. Ann. (PAS 301.1
et. seq. (2016)).

Finally, even if the letter was a properly admissible part
of the summary judgment record in support of the proposition
that the enforcement of § 225-A:26 is limited to tramway
operations, and even if it were a duly-promulgated article of
New Hampshire administrative law, it still fails to advance the
plaintiff's argument (to the extent it even addresses the issue
before the court), because it incorrectly contradicts the
governing statute, § 225-A:26.

As noted, the letter states that the authority of the
Tramway Safety Board is limited to ski lift operations and
"shall not extend to any other matters relative to the operation
of a ski area."[19]  This is undoubtedly true as far as it goes, as
it tracks the language of § 225-A:3-a.  That observation misses
the point, however, as § 225-A:26 does not limit enforcement of
§ 225-A to the Tramway Board.  To the contrary, the statute

---

[19] <u>Id.</u>

holds "any person" "guilty" of a violation or misdemeanor for violations of "this chapter," i.e., the entirety of N.H. Rev. Stat. Ann. § 225-A, a chapter which addresses a wider variety of ski-related activities than ski lifts and tramways. Thus, the letter contradicts the plain language of the statute by inaccurately portraying the applicability of § 225-A:26 as limited to "operating a tramway without it first being registered."[20] Under New Hampshire law, "[r]ules adopted by administrative agencies may not add to, detract from, or in any way modify statutory law," Elementis Chem., 152 N.H. at 803, and the letter's pronouncement, even it were a duly adopted Rule, would be invalid. See Appeal of Gallant, 125 N.H. 832, 834 (1984) (noting that agency regulations that contradict the terms of a governing statute exceed the agency's authority and are void). The statute penalizes not only failing to register, but also "violating this chapter or rules of the [Tramway Safety] board." (emphasis added). In effect, the plaintiff is asking the court to ignore the plain language of the statute in favor of a letter which is neither properly before the court nor is a valid administrative rule and which fails to address the issue

---

[20] Id.

before the court – the scope of § 225-A:26.  The court is not free to ignore the Federal Rules of Civil Procedure, New Hampshire's Administrative Procedure Act,[21] or the plain language of New Hampshire's ski-related statutes.

Accordingly, the court finds that New Hampshire statutory law provides no support to plaintiff's public policy argument.


## 2.  Injurious to the public interest

Plaintiff next argues that the Mount Sunapee release violates public policy as injurious to the public interest because Mount Sunapee is located on state-owned land that was, at least in part, developed with federal funding.  Plaintiff cites no authority for this argument, but instead relies on various provisions in the lease between Mount Sunapee and the State of New Hampshire.  None of these provisions establish or support the proposition that public policy prohibits the enforcement of the release.

For example, the lease requires the property to be used for "public outdoor recreational uses," "for the mutual benefit of the public and the Operator," and "as a public ski area . . .

---

[21] N.H. Rev. Stat. Ann. § 541-A.

for the general public."[22]  In addition, the ski area operator is
required to "allow public access," "maintain the Leased Premises
in first class condition," and "undertake trail maintenance."[23]
Even assuming, arguendo, that the lease theoretically
establishes public policy, the plaintiff makes no coherent
argument how the release in question runs afoul of any of its
provisions.  Instead, plaintiff argues, strenuously but without
authority, that condoning Mount Sunapee's requirement that a
skier agree to the release as a condition of skiing there
"effectively sanctions the conversion of public land by Mount
Sunapee."[24]  He also argues, again without authority, that:

> "[p]rivate operators of public lands, to which the
> public must be allowed access, cannot be allowed to
> limit access to such lands to those individuals who
> are willing to forego their statutory rights by
> exculpating the private operators from the
> consequences of their own negligence.  To hold
> otherwise, would mark the first step toward
> eliminating public access to public lands at the
> expense of the general public."

(Emphasis added).  Initially, the court reiterates its finding,
supra, Part III.A.1, that the language at issue in this case

---

[22] Pltff. Mem. of Law, doc. no. 15-3 at 13; id., Ex. J.

[23] Id.

[24] Id. at 17.

does not implicate plaintiff's statutory rights.  Moreover,
whatever persuasive force his policy-based arguments hold,
plaintiff cites no authority – in the form of cases, statutes or
regulations – upon which the court can rely to accept them.[25]

As a final public-interest related matter, the parties
dispute the import of liability releases used at Cannon
Mountain, a state-owned and operated ski area.  In its motion,
Mount Sunapee cited those releases to demonstrate that New
Hampshire's public policy does not generally disfavor liability
releases.[26]  Plaintiff, however, points out that because the
Cannon release does not use the word "negligence," it may, in
fact, not release Cannon from its own negligence.  See Barnes,
128 N.H. at 107 (noting that "the [exculpatory] contract must
clearly state that the defendant is not responsible for the
consequences of his negligence.").  Therefore, plaintiff
suggests, Sunapee's release may have exceeded what public policy
(as articulated in the Cannon release) permits.  Regardless of
the Cannon release's enforceability – a matter on which the

---

[25] Nor does plaintiff confront the reality that merely by
charging admission, Mount Sunapee "limits access to public
lands."

[26] Doc. no. 11-1 at 15.

court offers no opinion – the court finds that Mount Sunapee has

the better of this argument. New Hampshire's public policy is

likely best expressed by its legislative enactments,

particularly N.H. Rev. Stat. Ann. § 225-A:24,I, under which "ski

area operators owe no duty to protect patrons from the inherent

risks of skiing and thus are immunized from liability for any

<u>negligence</u> related to these risks." <u>Cecere v. Loon Mountain</u>

<u>Recreation Corp.</u>, 115 N.H. 289, 295 (2007). Such legislatively-

enacted immunity from negligence undercuts Miller's argument

that the Cannon release demarcates the outer boundary of New

Hampshire public policy. Ultimately, the court is skeptical

that, as both parties implicitly argue, the state's risk

management decisions and devices, as embodied in certain ski

area releases, constitute articulations of public policy.

Having failed to demonstrate any statutory transgressions

or injury to the public interest, plaintiff has failed to

establish a genuine issue of material fact as to whether the

Mount Sunapee release violates public policy.


B. Import of the agreement

The next factor the court must consider in assessing the

enforceability of the Mount Sunapee release is whether the

plaintiff or a reasonable person in his position would have understood its import. <u>Dean</u>, 147 N.H. at 266-67. Miller argues that a factual dispute exists as to this criterion because there was no "meeting of the minds" sufficient to form an enforceable binding agreement.[27] He bases this proposition, in turn, on two assertions: 1) that the release is unsigned; and 2) that he did not read it. The court finds that New Hampshire law does not require a signature to effectuate the terms of a release and that the plaintiff had – but chose not to take advantage of – an opportunity to read the release.

## 1. Signature

As an initial matter, the court notes that a "meeting of the minds" is not an explicit requirement of enforceability under New Hampshire law. The Court in <u>Dean</u> required only that "the plaintiff understood the import of the agreement or a reasonable person in his position would have understood the import of the agreement." 147 N.H. at 266-67. While a signature might be evidence of such understanding, it has never been held to be a prerequisite. Indeed, in <u>Gannett v. Merchants</u>

---

[27] <u>See</u>, <u>e.g.</u>, Pltff. Memorandum, doc. no. 15-3, at 30.

Mut. Ins. Co., 131 N.H. 266 (1988), the Court enforced an unsigned and unread release of an insurance claim.

Plaintiff asserts that the New Hampshire Supreme Court has never explicitly upheld the enforcement of an unsigned liability release. See, e.g., McGrath, 158 N.H. at 545 ("[t]he ski pass application signed by the plaintiff"); Dean, 147 N.H. at 266 ("Mr. Dean signed the Release before entering the infield pit area"); Audley, 138 N.H. at 417 ("two releases signed by the plaintiff"); Barnes, 128 N.H. at 106 ("release and waiver of liability and indemnity agreement he signed").  Even if one were to accept this proposition despite the holding in Gannett, which is arguably distinguishable from the line of New Hampshire cases just cited, it is not dispositive, because the Court has also never explicitly required a signature on a liability release as a condition of enforceability.

In a diversity case such as this one, if the state's highest court has not spoken directly on the question at issue, this court must try to predict "how that court likely would decide the issue," looking to the relevant statutory language, analogous state Supreme Court and lower state court decisions, and other reliable sources of authority.  Gonzalez Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318–19 (1st Cir. 2009).  A

review of an analogous decision of the New Hampshire Supreme
Court and several New Hampshire trial court decisions reviewing
ski area liability releases leads the court to conclude that
Miller's unsigned release is enforceable.

The court finds some guidance in Gannett, supra, where the
Court enforced a release of an insurance claim even though the
releasing party neither read nor signed the release, but
returned it before cashing the insurer's check.  131 N.H. at
270.  Especially salient here, the Court found it "irrelevant
whether [plaintiff] actually read the release, when the release
clearly and unambiguously stated the condition, and when she had
the opportunity to read it." Id. at 269-270 (emphasis added).
The Gannett Court cited the passage in Barnes, 128 N.H. at 108,
enforcing an un-read liability release where the defendant felt
rushed through the admittance line.  The Barnes court enforced
the release where "[t]here was no evidence . . . that [the
plaintiff] was denied the opportunity to read the body of the
release." Id.

Two New Hampshire Superior Court cases involving ski lift
ticket releases also inform this analysis.  See Comm'r of
Internal Revenue v. Bosch's Estate, 387 U.S. 456, 465 (1967)
(noting that decrees of lower state courts should be "attributed

some weight", but are not controlling, where the highest State court has not spoken on an issue). In <u>Camire v. Gunstock Area Comm'n</u>, No. 11-C-337, (N.H. Super. Ct., Mar. 22, 2013) (O'Neil, J.), the court granted the defendant ski area summary judgment based on an unsigned release. <u>Id.</u> at 6. ("[T]he fact that Ms. Camire did not sign the agreement does not render it unenforceable, as a participant's signature is not required under the factors set forth in [<u>Dean</u>]"), <u>aff'd on other grounds</u>, 166 N.H. 374 (2014). While the trial judge also noted that the ski area had a large sign near the ticket kiosk calling attention to the existence of the lift ticket release, and that plaintiff testified in her deposition that she would have understood the ticket's release language had she read it, <u>id.</u> at 3, the trial court's observation that the lack of a signature was not dispositive is entitled, as the United States Supreme Court has noted, to "some weight." <u>Bosch's Estate</u>, 387 U.S. at 465.

The court also draws some guidance from a New Hampshire trial court that denied a ski area operator's motion for summary judgment in another case involving a lift ticket release. In <u>Reynolds v. Cranmore Mountain Resort</u>, No. 00-C-0035, (N.H. Super. Ct., March 20, 2001) (O'Neil, J.), the plaintiff's lift

ticket contained a peel off backing similar to the one at issue
here, including the red "STOP" sign symbol.  Id. at 2.  The
plaintiff claimed that she did not sign the release and that the
release language was not conspicuous enough to give notice to a
reasonable person.  Id. at 5.  While the court did not rule on
the signature issue, it ruled that a jury issue remained as to
whether the "STOP" sign on the ticket was sufficiently
conspicuous, because the peel-off backing contained an
advertisement for a free workout, also written in red, in a
larger font than much of the warning on the backing.  Id. at 1-
2, 7.  In so ruling, the court relied on Passero v. Killington,
Ltd., 1993 WL 406726 (E.D. Pa. Oct. 4, 1993), a Pennsylvania
case in which the lift ticket at issue contained an
advertisement in a larger typeface than the release language.
Id. at * 7 ("[Plaintiff] argues that the exculpatory clause's
minuscule size, its setting against a dark background, and the
existence of a much larger advertisement for a 15% discount on a
"COMPLETE OVERNIGHT SKI TUNE-UP" on the lift ticket's adhesive
backing, all serve to distract the skier's attention away from
the substantive rights he or she is supposedly relinquishing by
purchasing the lift ticket.").  The Superior Court found that it
was "best left to the trier of fact to determine whether the

language of the lift ticket reasonably communicated the
existence of a contractual agreement to the purchaser . . . ."
Id.  Here, the Mount Sunapee lift ticket contains no such
distracting advertisement or font sizes greater than that of the
release language on the ticket.  As the distracting features
were the basis for the New Hampshire Superior Court's denial of
summary judgment in Reynolds, the lack of any such features here
is significant.  Accordingly, the court finds that the lack of a
signature on the lift ticket release is not, under the
circumstances of this case, a barrier to its enforceability
where the plaintiff had an opportunity to read it and the terms
were unambiguous and not contrary to public policy.


2.  Opportunity to read the release

     A plaintiff's failure to read a release "does not preclude
enforcement of the release."  Barnes, 128 N.H. at 108.  As long
as the plaintiff had an opportunity to read the release, even if
he chooses not to take it, a release can be enforced.  Dean, 147
N.H. at 270; cf. Jenks v. N.H. Motor Speedway, Inc., 2010 DNH
038 (material factual dispute existed as to whether plaintiff
had opportunity to read release where plaintiff put his name on
a sign-up sheet and release may have been obscured).

Plaintiff, a personal injury attorney, originally submitted two sparse affidavits in opposition to Mount Sunapee's dispositive motion.[28]  The affidavits' only reference to the release is that he did not read the language on the lift ticket or the peel off backing, nor was he instructed to.  He did not claim that he lacked the time or opportunity to read it, or was discouraged from doing so.  Nor do the affidavits state that he did not peel off the lift ticket from the backing paper.

To be sure, the plaintiff carries no burden of proof at summary judgment, but the sparse and somewhat cryptic nature of the plaintiff's affidavits – one of which conspicuously tracked the facts emphasized in the Reynolds Superior Court decision, supra, but added nothing more – led this court to ask several pointed questions at oral argument.  When pressed by the court regarding the omitted, but critical, subject matter, plaintiff's counsel conceded that Miller purchased the ticket, affixed it to his own jacket, had the opportunity to read the backing and the release, and would have recognized it as a release (although not as interpreted by Mount Sunapee).[29]

---

[28] Affidavits of Thomas J. Miller, doc. nos. 15-2 and 38-3.

[29] Transcript, doc. no. 52, at 70-71.

In an abundance of caution, and reluctant to grant summary judgment terminating plaintiff's claims without a more fully developed record, the court <u>sua</u> <u>sponte</u> ordered supplemental discovery concerning, <u>inter</u> <u>alia</u>, the issue of plaintiff's purchase and use of the lift ticket on the day of his injury.[30] Although the plaintiff resisted defense counsel's attempts to elicit direct answers to straightforward questions about his handling and viewing of the lift ticket, plaintiff's deposition confirmed certain relevant facts that his counsel conceded at oral argument. First, plaintiff testified that he was handed the lift ticket with the release language facing up, and did not see the language on the peel-off backing.[31] Nevertheless, plaintiff confirmed that he had the opportunity to read the release language on the lift ticket and the peel off backing before he removed the ticket from the backing and affixed it to his clothing.[32] Even though plaintiff testified that he attached

---

[30] <u>See</u> Joint Schedule, doc no. 51.

[31] Pltff. Dep., doc no. 61-2, at 134.

[32] Although plaintiff refused to answer whether he could have turned over the lift ticket and seen the language on the peel-off backing, he eventually conceded the point, when it was framed as a "hypothetical":

Q. And you agree that you could certainly have turned the ticket over and looked at the stop sign warning or at least perceived that the stop sign was there before putting the ticket on your clothes, correct?

A. You've already asked me that and the answer is, no, because I peeled off the back and put it on my body.

Q. That's not my question. You could have done that.

.    .    .    .

Q. I don't care whether you did it or not, that is certainly possible, correct?

A. That is not what happened here. If you're asking me --

Q. That's not my question.

MR. TENSEN: Objection, it's speculation.

A. I don't understand what you're asking me.

Q. Oh, come on. Any person could have taken that ticket, in your case you say you would have had to turn it over, taking the peel-off backing side and removed it with their fingers and in doing so they would have seen the stop sign, correct? That's a possibility.

A. Any person could have done a lot of things. I have no idea whether the stop sign was there so I have no idea.

Q. That's not my question. You need to answer the question.

A. If you're asking me a hypothetical --

the ticket to his pants immediately after receiving it, and thus did not read it, he agreed that he was not pressured to do so,[33] and had the opportunity to read it if he so chose.[34]

---

Q. Yeah, in your mind --

A. If you could let me answer, that would be helpful, instead of yelling at me across the table?

Q. Okay, go right ahead.

A. If somebody was given a ticket in your hypothetical, then conceivably, yes.

[33]     Q: You would agree that you weren't under any kind of pressure from the ticket person or anyone else at Sunapee to quickly put that ski ticket on and get out skiing, correct?

A: I agree there was no pressure.

Id. at 141.

[34] Id. at 137-148.  The discussion of Miller's opportunity to read the release – a significant factor under New Hampshire law – provides another example of the difficulty between Mount Sunapee's counsel and the plaintiff over seemingly evident issues such as the plaintiff's opportunity to read a lift ticket that was indisputably in his hand, and which he attached to his clothing using both hands.  The plaintiff suggested that his opportunity to read the release was somehow negated by his decision to quickly affix it to his clothing.  The following exchange took place:

Q: You would agree that you would have had
the opportunity to review this full lift
ticket, both the language on the ticket
itself and the peel-off backing, correct?

A: No. Because I peeled off the back and I
put it on my pants immediately.

Q: Was anybody telling you you had no
ability and didn't need to and couldn't read
this language before putting that ticket on
your clothing?

A: Nobody told me that, no.

Q: Okay, so you had the opportunity.  If you
wanted to go get a cup of coffee instead of
go skiing, you could have sat down at a
table in the cafeteria and read every word
on this, correct?

A: No, because I peeled it off and put it
on.

Q: Then at a minimum you would have had the
opportunity to read the ticket language
itself, correct?

A: What do you mean by the ticket language
itself?

Q: I mean . . . the part that isn't part of
the peel-off backing.

A: Again, I was handed the ticket and I
immediately peeled off the back and put it
on my pants.

Q: You need to answer the question.  You had
the opportunity, even if you never bothered

Based on the summary judgment record, the plaintiff's concessions at oral argument and his supplemental deposition testimony sua sponte ordered by the court in an abundance of caution, the court finds that the undisputed facts demonstrate that plaintiff purchased the lift ticket, peeled it from its backing before attaching it to his clothing, had the opportunity to read both sides of it,[35] and that "a reasonable person in plaintiff's position" would have "known of the exculpatory provision."  Barnes, 128 N.H. at 107.  The court therefore finds that plaintiff's decision to not read the lift ticket release language does not render it unenforceable.[36]

_____

> to look at the peel-off backing, to read the language on the ticket itself . . . .
>
> A: No, because I peeled it right off and put it on my pants.

Id. at 147-48.

[35] Plaintiff places great weight on the fact that he did not see the STOP sign language on the peel-off backing, which makes no difference for two reasons.  First, the plaintiff clearly had the opportunity to see and read it when he peeled off the backing and attached it to his zipper.  Second, the STOP sign language merely directed the ticket purchaser to the release language on the same ticket.

[36] Plaintiff's expert, Dr. Wilcox, opined that "the nature of, the design of, and the way it was treated by Mount Sunapee . . . rendered the Liability Release highly unlikely to be seen or

## C.  Contemplation of the parties

     The final factor the court considers is whether the
plaintiff's claims "were within the contemplation of the
parties."  Barnes, 128 N.H. at 107.  This factor concerns
whether plaintiff's claims were within the scope of the release.
Dean, 147 N.H. at 267.  To determine the scope and application
of a liability release agreement, the court must examine its
language.  Dean, 147 N.H. at 267.  If "the release clearly and
specifically indicates the intent to release the defendant from
liability for personal injury caused by the defendant's
negligence, the agreement will be upheld."  Id.  The court gives
the language of the release "its common meaning and give[s] the

_____

read by the typical patron . . . .  It follows that there was
nothing unusual about the conduct of Mr. Miller in not noticing
it."  Pltff. Obj. to Mot. to Strike, doc. no. 62, at 4.
(Emphasis in original). As the court noted above, plaintiff
testified that he had – but did not take advantage of – the
opportunity to read the release.  He recalled at deposition that
it was handed to him with the release language facing up, and he
conceded at oral argument what was all but self-evident: that he
(like any reasonable person) would recognize it as a release,
though he disputes its scope.  That is all New Hampshire law
requires.  See Dean, 147 N.H. at 270.  It is the scope and
meaning of the release language that he disputes, and which is
implicated by the next factor of the Dean/Barnes three-part
test.  See infra Part III.C.

contract itself the meaning that would be attached to it by a
reasonable person." Id. "All that is required" is for the
language to "clearly and specifically indicate[] the intent to
release the defendants from liability for personal injury caused
by the defendants' negligence . . . ." McGrath, 158 N.H. at
545.

While plaintiff's counsel conceded at oral argument that a
reasonable person would have recognized the lift ticket language
as a release, he argues that it would only be understood as
applying to "the inherent risks of skiing," as enumerated in §
225-A:24,[37] and not to the circumstances of plaintiff's

---

[37] In relevant part, N.H. Rev. Stat. Ann. § 225-A:24 provides:

    I. Each person who participates in the sport of
    skiing, snowboarding, snow tubing, and snowshoeing
    accepts as a matter of law, the dangers inherent in
    the sport, and to that extent may not maintain an
    action against the operator for any injuries which
    result from such inherent risks, dangers, or hazards.
    The categories of such risks, hazards, or dangers
    which the skier or passenger assumes as a matter of
    law include but are not limited to the following:
    variations in terrain, surface or subsurface snow or
    ice conditions; bare spots; rocks, trees, stumps and
    other forms of forest growth or debris; terrain, lift
    towers, and components thereof (all of the foregoing
    whether above or below snow surface); pole lines and
    plainly marked or visible snow making equipment;

accident.[38]  As explained below, this argument is based on an incomplete reading of the release and a flawed reading of persuasive New Hampshire Supreme Court precedent.  It is therefore rejected.

Plaintiff argues that the first words of the release – "Skiing, snowboarding, and other winter sports are inherently dangerous"[39] – limit the scope of the release to the inherent risks of skiing as set forth in N.H. Rev. Stat. Ann. § 225-A:24, which, he posits, do not include collisions with unmarked or not visible snow-making equipment.  The remainder of the release, however, is far broader, explicitly encompassing "all risks . . . of personal injury . . . resulting from . . . inherent **or any**

---

collisions with other skiers or other persons or with any of the categories included in this paragraph.

[38] Transcript, doc. no. 52, at 53, 71

[39] The court notes that plaintiff's memorandum of law twice highlights the term "inherently" with underlining and bold type, as if that language were emphasized on the release, while the release itself does not.  Doc. no. 15-3 at 19-20.  The memorandum gives no indication, as one would expect, that the emphasis is the plaintiff's.  The Bluebook: A Uniform System of Citation R. 5.2(d)(i), at 83-84 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015).  Without suggesting that the plaintiff's version of the release would lead to a different result, the court notes that its analysis relies upon the typeface used in the release itself.

**other** risks or dangers." (Emphasis added). Additional language in the release is similarly broad:

> **I RELEASE MOUNT SUNAPEE RESORT**, its parent companies, subsidiaries, affiliates, officers, directors, employees and agents **FROM ANY AND ALL LIABILITY OF ANY KIND INCLUDING NEGLIGENCE** which may result from conditions on or about the premises, operation of the ski area or its afacilities [sic] or from my participation in skiing or other winter sports, accepting for myself the full and absolute responsibility for all damages or injury of any kind which may result from any cause.[40]

(Bold emphasis in original; underlining added). While plaintiff acknowledges that his "participation in skiing" might trigger the release, he argues that the expansive "any and all" language is qualified by the first sentence's reference to skiing as "inherently dangerous," which, he asserts, warrants limiting the release to the risks itemized in § 225-A:24.

In support of his "inherent risks" argument, plaintiff relies on Wright v. Loon Mountain Recreation Corp., 140 N.H. 166 (1995), a case in which a horseback rider was kicked by her guide's horse, allegedly due to the guide's negligence. Id. at 168. The Court in Wright held that a release which first noted

---

[40] Plaintiff's quotation of this portion of the release omitted the language following "winter sports." Once again, the court relies on the language of the release itself, rather than plaintiff's incomplete quotation.

the "inherent hazards" of horseback riding "obscured" the later following exculpatory clause, part of which resembled the one employed here by Mount Sunapee. <u>Id.</u> at 170. But there is a significant textual difference between the release in <u>Wright</u> and the one at issue here, and that difference was the lynchpin of the <u>Wright</u> Court's analysis: the operative language of the <u>Wright</u> release affirmatively referred back to the "inherent hazards" language. In <u>Wright</u>, the exculpatory clause purporting to release the defendant from "any and all" liability began with the phrase "I therefore release . . . ." <u>Id.</u> (emphasis added). The Court found the word "therefore" not only significant but dispositive, noting that it means, <u>inter alia</u>, "for that reason" and thus "cannot be understood without reading the antecedent [inherent hazards] language." <u>Id.</u> Accordingly, the Court concluded, "[b]ecause the exculpatory clause is prefaced by the term 'therefore,' a reasonable person might understand its language to relate to the inherent dangers of horseback riding and liability for injuries that occur "for that reason."[41] <u>Id.</u>

---

[41] There were other deficiencies in the release in <u>Wright</u> that are not relevant here, including whether it encompassed horses not ridden by the plaintiff. 140 N.H. at 171.

44

The Court ultimately held that the negligence of a guide is not such an "inherent risk." Id.

Unlike the release in Wright, however, the Mount Sunapee release contains no such "therefore" or other referential language which might call into question the breadth of the language that follows. As such, the court finds that the release "clearly state[s] that the defendant is not responsible for the consequences of his negligence," Barnes, 128 N.H. at 107, and explicitly called particular attention "to the notion of releasing the defendant for liability for its own negligence." Cf. Audley v. Melton, 138 N.H. 416, 419 (1994) (rejecting exculpatory clause because it failed to call particular attention to releasing defendant from liability). The court therefore finds that the Mount Sunapee release is not limited to the "inherent risks" of skiing enumerated in N.H. Rev. Stat. Ann. § 225-A:24, I. Accordingly, even assuming that Miller's accident did not result from an "inherent risk" of skiing, his claim is nevertheless encompassed by the terms of the release and within the contemplation of the parties.

D.  Reckless, wanton or positive misconduct

After Mount Sunapee's initial motion for judgment on the
pleadings raised the lift ticket release as a defense, Plaintiff
added four paragraphs to his suit in an Amended Complaint, all
in support of his one negligence count.  The new additions quote
from a handwritten note on a "grooming report" prepared by Mount
Sunapee Mountain Operations Manager Alan Ritchie two weeks prior
to plaintiff's accident.  Ritchie's note states the following:
"keep the skier's left guardrail 3' from the tower guns at BTM
(Hidden Hydrants below the snow[)].  Remove 2' of snow from just
above the Blue Shield around the Teckno fan gun."[42]  Based solely
upon this entry, Miller asserts that Mount Sunapee knew of
buried snowmaking equipment and that failing to mark it or
otherwise make it visible both violated its statutory duty and
constituted "reckless, wanton, and positive acts of misconduct"
from which it can not legally be released.[43]

In response, Mount Sunapee argues: 1) that the allegations
do not support a claim for a statutory violation; 2) that New
Hampshire law does not recognize extra-culpable, non-releasable

---

[42] Amended Complaint, doc. no. 34, ¶ 47.

[43] Id. ¶¶ 44-47.

categories of negligence; and 3) that the Amended Complaint and attached documents fail, in any event, to set forth facts amounting to anything other than ordinary negligence.  The court has already found no statutory violation[44] and further finds that the complaint, even as amended, alleges nothing more than ordinary negligence.

## 1.  Recklessness

Plaintiff argues that the additional allegations in the Amended Complaint state a claim for reckless behavior, which, he argues, is not within the purview of the release.  The court finds that the new amendments do not allege conduct that is more culpable than negligence, which is subject to the terms of the Mount Sunapee release.[45]

---

[44] Supra, § III.A.1 (finding that § 225-A does not require ski area operators to clear snow from hidden equipment).

[45] The court notes at the outset that it is skeptical of the relevance of the quoted grooming report, as the uncontroverted evidence shows that it relates to a type of equipment ("hydrants") different from the equipment with which Miller collided ("snow-gun holder"), located in a part of the ski area physically removed from the location of plaintiff's accident, and which was written more than two weeks prior to the accident. See Def. Supp. Mem., doc. no. 36-1, at 5; Ritchie Affidavit, doc. no. 17-1, ¶¶ 8-9.

The New Hampshire Supreme Court generally refers favorably
to the Restatement of Torts and has done so with respect to its
description of "reckless" conduct:

> Under the Restatement [(Second) of Torts], § 500, at
> 587 (1965), conduct is "reckless" if it "would lead a
> reasonable man to realize, not only that his conduct
> creates an unreasonable risk of physical harm to
> another, but also that such a risk is substantially
> greater than that which is necessary to make his
> conduct negligent." Id. The conduct "must involve an
> easily perceptible danger of death or substantial
> physical harm, and the probability that it will so
> result must be substantially greater than is required
> for ordinary negligence." Id. comment a at 588.

Boulder v. Eli & Basse Cohen Found., 166 N.H. 414, 421 (2014).


As the Court noted in Thompson v. Forest, 136 N.H. 215, 220
(1992), a litigant's characterization of conduct as evincing a
particular culpable mental state is not particularly useful.
"Recklessness," at a minimum, is conduct "where the known danger
ceases to be only a foreseeable risk which a reasonable person
would avoid, and becomes in the mind of the actor a substantial
certainty." Id. (quoting WP Keaton, et al., Prosser and Keaton
on the Law of Torts § 8 (5th ed. 1984)). Here, notwithstanding
the descriptive adjectives employed by the plaintiff, the facts
and allegations pled do not suggest that, to anyone affiliated

with Mount Sunapee, there was "a substantial certainty" that serious foreseeable harm would occur based on its alleged conduct or that Mount Sunapee's conduct involved an unreasonable risk of physical harm "substantially greater than is required for ordinary negligence or that the risk was one involving an easily perceptible danger of death or substantial physical harm." Boulder, 166 N.H. at 422.

Plaintiff relies on a recent New Hampshire Superior Court case involving an injured ski lift passenger in which the trial judge held that the plaintiff's allegations of recklessness were sufficient to survive a motion for summary judgment.[46] In Perry v. SUCH. Dev. Corp., No. 2015-CV-00678 (N.H. Super. Ct., Sept. 13, 2017) (Temple, J.), the child plaintiff was injured after first dangling from, and then falling from, a chair lift into which she was improperly loaded. Id. at 3. There, the plaintiff successfully pled facts that alleged recklessness and avoided the ski area's enforceable negligence release. Id. at

---

[46] Although the Perry Court was deciding a summary judgment motion, it applied a motion to dismiss standard to the recklessness issue because the defendant was attacking only the sufficiency of the Complaint. Here, by contrast, the documents plaintiff submitted in conjunction with his Amended Complaint are part of the rationale for converting the original motion for judgment on the pleadings into one for summary judgment.

4. Specifically, the plaintiffs in Perry alleged that the ski area's:

> employee(s)['] total and complete failure to monitor
> the safe and proper loading of the Rocket chair lift
> in any fashion, coupled with the undisputed failure
> (actions or inactions) to stop the chair lift once a
> life threatening emergency was clearly in progress and
> ongoing for a considerable period of time, were
> failures to do acts which the employees had a duty to
> perform for [plaintiffs] and constitute a reckless
> disregard of safety.

Id. at 20. The court denied the ski area's motion for summary judgment on the recklessness issue, first noting the allegation that there "were multiple employees of Crotched Mountain in or around the area observing that Sarah was not able to properly and/or safely board the Rocket chair lift; but rather [was] dangling from the chair lift."  Id. at 15.  The court found this allegation sufficient to support an inference that the ski area's employees "knew that [the child plaintiff] was not properly loaded on the chair lift, but chose not to act."  Id. The court additionally cited the allegations that the ski area's employees knew that their failure to "stop the chair lift once a life threatening emergency was clearly in progress" would create an "unreasonable risk of physical harm or death."  Id.  These facts, the Superior Court concluded, were sufficient to establish a claim of reckless conduct. Id.

In reaching its decision, the Perry court assumed that
recklessness involved a defendant's "conscious choice."  Id. at
24 (citing State v. Hull, 149 N.H. 706, 713 (2003)).  Here,
plaintiff argues that a reasonable inference can be made that
Mount Sunapee knowingly disregarded the risk of harm posed by
hidden snowmaking equipment, and that they "knew that 'hidden'
hydrants posed a danger, but chose not to act.[47]

The court finds no such inference.  As noted, the amended
allegations do not pertain to a time or place related to
Miller's accident.  There is nothing in the Ritchie affidavit
that supports an allegation that Mount Sunapee made a "conscious
choice" to create a "risk that was substantially greater than is
required for ordinary negligence or that . . . [involved] an
easily perceptible danger of death or substantial physical
harm."  Boulder, 166 N.H. at 422 (internal quotation marks
omitted).  Significantly, the allegations in this case stand in
stark contrast to those in Perry, where ski area employees
allegedly ignored a nearby lift passenger already in obvious
danger, a child literally dangling from the moving chair lift.

---

[47] Pltff. Supp. Mem., doc no. 46, at 7.

Under plaintiff's theory, <u>any</u> collision with buried snowmaking

equipment would constitute a claim for recklessness.

One of the cases cited in <u>Perry</u> supports the court's

conclusion.  In <u>Migdal v. Stamp</u>, 132 N.H. 171 (1989), the

plaintiff, a police officer, was shot by a 15-year old who had

been involuntarily hospitalized due to mental health issues.

<u>Id.</u> at 173.  The day after his release into his parents'

custody, the teen took several guns and hundreds of rounds of

ammunition from an unsecured gun cabinet in their home, fired

them throughout the house, and then shot and injured the

plaintiff, who responded to the scene.  <u>Id.</u>  The injured officer

sued the shooter's parents, who sought dismissal based on the

"fireman's rule."[48]  After first noting that the rule bars claims

of negligent, but not reckless, conduct, <u>id.</u> at 176, the Court

concluded that the plaintiff had adequately pled recklessness by

alleging that the parents "failed to seek recommended medical

treatment" for their son and allowed him access to "an array of

firearms and ammunition," despite their knowledge that their son

_____

[48] The fireman's rule precludes "a police officer or fireman,
both of whom are paid to confront crises and allay dangers
created by an uncircumspect citizenry, from complaining of
negligence in the creation of the very occasion for their
engagement."  <u>England v. Tasker</u>, 129 N.H. 467, 471-72 (1987).

"was suffering from mental and emotional instabilities," had "exhibited dangerous propensities," and had ransacked and vandalized the house the day before. Id. Mount Sunapee's conduct — failure to mark or make visible the snow gun holder — is neither of the same type nor degree as the defendants' conduct in Migdal.

A ski case from the District of Massachusetts is also instructive. In Brush v. Jiminy Peak Mountain, 626 F. Supp. 2d 139 (D. Mass. 2009), a ski racer was injured when she lost control and collided with a ski tower support located off the trail. Id. at 143. In suing, inter alia, the ski area, the plaintiff alleged that netting and other safety devices should have been placed around the support, as required by certain ski racing standards and as had been done by the defendant in the past. Id. at 145. In order to avoid application of a release, the plaintiff asserted a claim for gross negligence, which, under Massachusetts law, is a less culpable standard than recklessness. Id. at 151 (citing Altman v. Aronson, 121 N.E. 505, 506 (Mass. 1919)). The Court concluded that plaintiff had alleged only simple negligence. Id. The Court first observed that "[t]here is no evidence in the record, and indeed no allegation, that any of the Defendants, or anyone at the

competition, became aware that there was an area of the trail without netting where netting was normally placed and declined to remedy the situation." Id. Ultimately, the Court held, "[a]t most there was a collective failure to take a step that might have lessened the injuries suffered by Plaintiff. No reasonable jury could find that this simple inadvertence, no matter how tragic its consequences, constituted gross negligence." Id.

The court views the conduct alleged here as much more akin to that alleged in Brush – which alleged conduct that was less culpable than recklessness – than that in Perry or Migdal. The factual allegations in this case fall far short of recklessness. First, as previously noted, the grooming report on which plaintiff relies is remote both in time and location. Next, the conduct alleged here is significantly less egregious than the allegations in Perry, where ski area employees allegedly ignored a nearby passenger already in danger of falling from a lift chair, or the conduct in Migdal, where the defendant parents, one day after their son had exhibited mental instability, ransacked the family home, and exhibited dangerous tendencies, failed to seek treatment for him and to secure multiple firearms and ammunition. As in Brush, the most that can be said here is

that Mount Sunapee failed to take a step that – while not legally required, see supra, § III.A.1 – might have prevented plaintiff's accident. These allegations do not support a claim that their acts or omissions in not clearing snow away from a snow gun holder in an ungroomed area "were substantially more serious" than ordinary negligence. Boulder, 166 N.H. at 422.[49]

## 2. Wanton and positive misconduct

In an attempt to characterize his claims in such a way to avoid the language of the release, plaintiff's Amended Complaint describes them as "wanton and positive acts of misconduct," that is, more culpable than negligence, but not intentional.[50] The court, however, has already determined that the Complaint

---

[49] Mount Sunapee also claims that an allegation of recklessness would still be barred by the release because recklessness is only a degree of negligence, which as previously noted, New Hampshire does not recognize. Barnes, 128 N.H. at 108. The court does not reach this issue, however, as New Hampshire law is unclear on the issue. While the Court in Akerly, supra, noted that reckless conduct is "an aggravated type of negligence," other decisions have recognized contexts in which this is not the case. See Migdal, supra (fireman's rule); Hickingbotham v. Burke, 140 N.H. 28 (1995) (allowing social host liability for reckless, but not negligent, conduct).

[50] Amended Complaint, doc. no 34, ¶ 47.

alleges no more than ordinary negligence, so this argument
fails.


3.  Potential certification

     If the court had found that the facts alleged by the
plaintiff could constitute conduct more culpable than
negligence, it would have considered certifying an unresolved
question to the New Hampshire Supreme Court: whether conduct
more culpable than negligence, but less than intentional could
be the subject of a release like the one at issue here.  See
N.H. Sup. Ct. R. 34.  In the absence of such allegations,
certification is unnecessary.


**IV.  Conclusion**

     The undisputed factual record shows that plaintiff
purchased and affixed to his clothing a lift ticket at Mount
Sunapee that unambiguously released the ski area from liability
from its own negligence, that such a release does not violate
public policy, and that plaintiff's signature was not required
to effectuate its terms.  Furthermore, there is no material
factual dispute that plaintiff had the opportunity to read both
the cautionary language on the ticket's peel-off backing and the

release language itself, that he would have understood that language to constitute a release and that a reasonable person in his position would have understood that the release exculpated Mount Sunapee from its own negligence.

As plaintiff has alleged only that Mount Sunapee's negligence caused his injuries, and that the facts he alleges do not constitute conduct more culpable than negligence, the court finds that plaintiff's claims fall within the ambit of the Mount Sunapee release and that the release is enforceable against the plaintiff. Therefore, defendant's motion for judgment on the pleadings, having been converted to a motion for summary judgment[51] is GRANTED.[52]

      **SO ORDERED.**

                                _____
                                Joseph N. Laplante
                                United States District Judge

March 31, 2018

cc:  Arend R. Tensen, Esq.
     Thomas B. S. Quarles, Jr., Esq.
     Brendan P. Mitchell, Esq.

---

[51] Doc. no. 36.

[52] As noted _supra_, n.3, defendant's motion to strike plaintiff's expert is DENIED.